[No. B012755. Second Dist., Div. Seven. Feb. 23, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL LEE YOUNG, Defendant and Appellant.

892

894

**COUNSEL**

Jonathan Milberg, under appointment by the Court of Appeal, and Anson & Milberg for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Christine C. Franklin and Joan Comparet, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KRIEGLER, J.***—The instant appeal arises from appellant's act of driving an automobile down a crowded sidewalk in Westwood on the eve of the 1984 Summer Olympics. A jury convicted appellant of one count of first degree murder (Pen. Code, § 187) and 48 counts of attempted murder in the first degree (Pen. Code, §§ 664/187). The jury also found that appellant used a deadly weapon, an automobile, in each count (Pen. Code, § 12022, subd. (b)) and that great bodily injury was inflicted in 20 of the attempted murder counts (Pen. Code, §§ 12022.7 and 1203.075). The same jury found appellant sane at the time of the commission of the offenses. Appellant was sentenced to 80 years and 4 months on the attempted murder counts, and a consecutive term of 25 years to life for murder. The appeal is from the judgment.

There was no material issue at trial as to appellant's participation in the charged offenses. The issues at trial instead centered on appellant's ability to form the requisite mental states for murder and attempted murder, as well as appellant's sanity. We therefore summarize the facts in light of the issues at trial.

*Assigned by the Chairperson of the Judicial Council.

GUILT PHASE FACTS

A. *The Prosecution Case*

On July 27, 1984, appellant drove from the intersection of Westwood Boulevard and Weyburn onto a sidewalk crowded with at least 300 people. Appellant accelerated on the sidewalk after striking the first pedestrian. The car's speed was estimated to be as much as 40 or 50 miles per hour.

As appellant proceeded down the sidewalk, people were struck by the car. Some victims were thrown clear, while others were carried on the front, hood and roof of the car. The vehicle came to rest after colliding with a kiosk protecting a bus bench at Westwood Boulevard and Kinross. Appellant tried to back up, but his car struck the side of a Bank of America.

Appellant exited his car, threw his arms in the air and smiled at a passerby who asked if appellant was hurt. Appellant moved away from his vehicle into the gathering crowd, where he was taken into custody by officers.

As a result of appellant's conduct, 15-year-old Ellen Deutsch was killed. Among the others hurt, the injuries ranged from one victim who suffered complete paralysis and amputation of the foot, to skull fractures, brain damage, broken arms, legs and backs. A two and one-half-year-old baby, who was struck while in her stroller was in a coma for 10 days, is partly paralyzed and lost speech and part of her vision.

After appellant was arrested he voluntarily gave the police samples of his blood, breath and urine. Analysis of the results of these tests revealed no alcohol or drugs in appellant's system. An examination of the car appellant drove revealed no mechanical defects in the brakes, steering or throttle.

Appellant was interviewed at the West Los Angeles police station at 3:15 a.m. on July 28, 1984, by Detective Patrick Aguiano. Also present was Deputy District Attorney John Reid.

When questioned regarding the incident in Westwood, appellant said he lifted some keys from his sister's purse and drove to Westwood in his brother's car. Appellant chose Westwood because he might get someone important "and they're gonna put it on the news I did that." He thought about going to Rodeo Drive, "but it's not crowded enough."

Appellant said he drove to UCLA and made a U-turn. He picked the street because it was crowded. He just wanted to get the general public, and he hoped they put it on television.

Appellant said he had started to do it the day before, but his sister got the car keys and left. He planned to hurt someone and made no attempt to miss pedestrians on the sidewalk. Appellant stated, "he had it to the floor" and "burnt rubber in front of the people." He saw the people he was hitting and made sure he ran down the whole block. If he could, appellant would have gone another block and run down as many as possible, but the car got stuck.

Appellant said he knew if he ran down people he would go to jail. He said, "I knew it was wrong," and that "this time I'd be arrested."

Appellant also made a series of bizarre statements during the course of the interview. He referred to a law passed by Congress which required him to write songs for free and live like "trash." Appellant referred to songs stolen from him by various famous recording artists. Appellant claimed he had turned into Michael Jackson. Appellant also said he had done this before and was never arrested. Additionally, he had killed 50 children at an elementary school.

Appellant had taken one Triavil at 4 p.m. He said Triavil has no effect on him and does not make him high. Appellant said, "They don't do anything to me."

B. *Defense*

Appellant's family life was portrayed through the testimony of his mother, brother and sister. Appellant was one of 12 children who moved from a housing project in Los Angeles to Inglewood in 1975. After the move appellant became interested in music and although he did not play an instrument, he did work as a sound mixer for friends in a band.

Appellant's behavior, which had been good, changed in 1982 or 1983. He began wearing ragged clothes, talking to himself and imitating celebrities. He twice kicked in the door at the home of a friend, and was placed on diversion as a result of the second incident. He also attempted to attack one of his brothers with a baseball bat.

In September 1983, appellant poured gasoline on himself, and after being restrained, was taken first to Harbor-UCLA Medical Center and then to Hillview Medical Center for 72 hours. Appellant was diagnosed by one psychiatrist at Harbor-UCLA as suffering from undifferentiated chronic schizophrenia. A second psychiatrist there diagnosed appellant as suffering from a schizophrenic form disorder. At the Hillview Medical Center appellant was also diagnosed as having a schizophrenic form disorder.

Upon his release from the 72-hour commitment, appellant began being treated monthly by Dr. Garold Faber, who also diagnosed appellant as suffering from schizophrenic form disorder. Dr. Faber prescribed Triavil, a combination antipsychotic and antidepressant. Dr. Faber observed appellant's thoughts to be both grandiose and paranoid. Appellant complained of people stealing his music and the police refusing to do anything about it. Appellant told Dr. Faber he had been told by his attorney to get treatment to avoid going to jail.

Dr. John Stalberg, a psychiatrist, was appointed to examine appellant regarding competence to stand trial and for a diagnosis relating to the case. After reviewing appellant's medical and psychiatric records, the police reports and the tape recorded interrogation on the night of the incident, Dr. Stalberg opined appellant suffered from chronic paranoid schizophrenia on July 27, 1984. The characteristics supporting this diagnosis were the history of mental problems going back more than six months, the delusional belief others were controlling appellant with ulterior motives and appellant's inappropriate response (affect) to his situation. Dr. Stalberg doubted the truth of appellant's tape recorded statement that he had intended to drive down a sidewalk the night before, because bizarre acts of this nature tend to be impulsive.

Dr. Stalberg believed appellant's mental illness substantially affected his reasoning and social behavior. Appellant's reasoning was psychotic and not parallel with what was going on in society. Appellant was both compulsive and obsessive. Dr. Stalberg felt it was malpractice to prescribe Triavil to someone with delusions because the antidepressant would worsen appellant's delusions.

Appellant was also diagnosed by Dr. Kenshal Sharma, a psychiatrist, as suffering from a schizophrenic disorder, paranoid type. The symptoms observed by Dr. Sharma included fixed false beliefs, hallucinations, disorganized thinking, suspicion and distrust. Appellant's affect was inappropriate for what he discussed and his situation in general.

Dr. Sharma felt appellant's behavior was compulsive in that it was in response to his obsessions with his songs being stolen. Appellant's behavior was impaired due to his mental illness, and he drove down the sidewalk in response to the obsession people had stolen his songs and deprived him of his livelihood.

According to Dr. Sharma appellant knew the people he hit were human beings who were likely to be injured when appellant drove down the side-

walk. Appellant did believe his actions were against the law and he would go to jail as a result of his conduct.

Appellant's testimony consisted of a mixture of his version of the events on the night of July 27 and the strange events that occurred during his life. Appellant was driving in Westwood when two females drove up next to him and said something appellant did not like. Appellant got mad and drove onto the sidewalk. He knew he was hitting people and had hate in him.

Among the incidents described by appellant was a law passed by Congress in 1976 requiring him to write songs, for which he was paid $7 billion, which was stolen from him. Appellant had driven his car into people on a sidewalk four times before, although the police released him each time. He had also shot people with a machine gun at a McDonald's and cut up a judge. Appellant claimed to have been beaten by the police and President Carter. Additional incidents of a similar nature were described in appellant's testimony.

## C.  *Rebuttal*

Dr. Jay Zisken, a psychologist, testified in rebuttal that psychiatry and psychology are a conglomeration of unvalidated theories of human behavior. Dr. Zisken believes there is an inadequate body of knowledge and methodology for diagnosing mental problems.

If psychiatry is a science, it is in its infancy, according to Dr. Zisken. Dr. Zisken is of the opinion that a psychiatric diagnosis of a person's mental condition at a time prior to the diagnosis is "worth next to nothing."

SANITY PHASE

Dr. Stalberg formed the opinion appellant was a paranoid schizophrenic on August 20, 1984, and December 8, 1984, the two occasions he examined appellant. Schizophrenia creates confusion and disorganization in the thinking process, which manifests itself in delusions and hallucinations. Schizophrenia, according to Dr. Stalberg, affects the superego, which normally helps the individual differentiate between right and wrong. Because schizophrenics do not empathize with others, they are prone to ignore their welfare.

In a letter to the trial court, Dr. Stalberg stated appellant was sane at the time of the offense if the law was interpreted simplistically. Appellant knew it was criminal to run down people with a car, and if criminality equates with wrongfulness, appellant was aware his act was wrong.

Dr. Stalberg also wrote in his letter to the trial court that if understanding the "nature and quality" of one's act meant that appellant knew he was in a car and running down people, appellant was sane. If "quality" refers instead to good or bad, appellant believed good would come from his actions in that it would force a resolution of the persecution he had endured. Also, if wrongfulness meant a justification for appellant's behavior, appellant was not sane because appellant believed he was morally right due to the effect of appellant's mental condition on his understanding.

Dr. Sharma diagnosed appellant as suffering from a schizophrenic disorder, paranoid type. Appellant's condition affected his conscience (superego) by causing irrational beliefs. However, the most reliable factor Dr. Sharma relied upon was appellant's tape recorded interrogation on the night of the incident, and Dr. Sharma concluded appellant was sane. Dr. Sharma wrote a report for the court indicating appellant did know and understood the nature and quality of his act, and was aware his conduct was legally wrong.

Dr. Sharma also believed appellant felt he was morally right in his conduct. Appellant believed, due to his mental illness, he was paying back people for harm done to him. But appellant knew society would not "buy it" and he would be punished for his conduct.

### APPELLANT'S CONTENTIONS

Appellant contends as follows: 1. The attempted murder conviction in count 16 is not supported by substantial evidence to prove the victim was present at the scene;

2. The trial court abused its discretion in denying the motion for appointment of a psychiatrist to assist defense counsel in phrasing questions during trial;

3. The trial court gave an unduly restrictive interpretation of Penal Code sections 28 and 29 which denied appellant the opportunity of proving he lacked the required mental states for murder and attempted murder;

4. It was reversible error for the trial court to refuse to instruct on involuntary intoxication based upon evidence appellant was under the influence of Triavil;

5. Conflicting instructions allowed the jury to conclude appellant could be convicted of attempted murder based on an implied malice theory;

6. The trial court committed reversible error by refusing to admit appellant's pre-offense psychiatric records; and

7. The trial court committed reversible error in refusing to instruct the jury on the consequences of a verdict of not guilty by reason of insanity.

I

THE ATTEMPTED MURDER CONVICTION IN COUNT 16 IS SUPPORTED BY SUBSTANTIAL EVIDENCE

■ Appellant argues there is insufficient evidence to support the conviction in count 16 for attempted murder of Jacqueline King. Appellant contends, "There was literally no evidence Ms. King was ever present at the scene," and since neither Ms. King nor any other witness testified as to her presence, the conviction must be reversed.

Appellant's contention is based on the erroneous premise that no witness placed Ms. King at the scene. However, Bryan King testified he was walking with his wife, Jacqueline, on Westwood Boulevard on July 27, 1984, at the time of the incident. Mr. King described how his wife "was pulled out of my hand actually as the car went by." He ultimately found her in the gutter on Westwood Boulevard. Ms. King suffered a depressed skull fracture and a broken leg.

Since there was direct evidence of Ms. King's presence at the scene and the injuries she sustained, appellant's contention is clearly without merit. Substantial evidence supports the conviction in count 16. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

II

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO APPOINT A PSYCHIATRIST TO ASSIST COUNSEL IN PRESENTATION OF A DEFENSE

On the day jury selection began, defense counsel orally moved for appointment of Dr. Vicory, a psychiatrist, pursuant to Evidence Code sections 730 and 1017 to assist counsel during the testimony of appellant and psychiatrists appointed on the issue of sanity. Counsel explained Dr. Vicory would "give me certain questions and how to phrase these questions" to appellant during the guilt phase of trial. Counsel did not want another doctor appointed pursuant to Penal Code section 1027; two doctors had already been so

appointed. Instead, he wanted a doctor "to assist me who would have an allegiance to me."

The court inquired if counsel had case authority allowing the public defender to pick a doctor to sit with him to listen to other doctors testify. Counsel replied that because a wealthy defendant could have a battery of doctors, his indigent client was entitled to a similar opportunity. The court indicated that if a doctor was appointed, it would be a doctor selected by the court rather than by defense counsel.

Counsel reiterated his desire to have a trained psychiatrist next to him during appellant's testimony "to give to me the questions that would have some bearing so that the doctors who are in court during his testimony can make a thorough evaluation of my client's state of mind at the time of the alleged offense." The court denied the motion for appointment of Dr. Vicory in the absence of authority from a higher court.

■ Appellant argues that defense counsel demonstrated to the trial court that the appointment of Dr. Vicory was necessary. It is further argued that if the trial court did not wish to appoint Dr. Vicory, then appointment of another psychiatrist should have been considered.

■ It is well settled that an indigent felony defendant is not only entitled to the appointment of counsel, but is also entitled to those ancillary services which are reasonably necessary to insure presentation of a defense. (*Ake* v. *Oklahoma* (1985) 470 U.S. 68, 76-77 [84 L.Ed.2d 53, 61-62, 105 S.Ct. 1087]; *Corenevsky* v. *Superior Court* (1984) 36 Cal.3d 307, 319-320 [204 Cal.Rptr. 165, 682 P.2d 360]; *Mason* v. *State of Arizona* (9th Cir. 1974) 504 F.2d 1345, 1351, cert. den. (1975) 420 U.S. 936 [43 L.Ed.2d 412, 95 S.Ct. 1145].) "But within the rule just stated is its limitation: the burden is on the defendant to make a showing of need, before the court is required to appoint an expert." (*People* v. *Worthy* (1980) 109 Cal.App.3d 514, 521 [167 Cal.Rptr. 402].) It is only *necessary* ancillary services to which an indigent is entitled. (*Puett* v. *Superior Court* (1979) 96 Cal.App.3d 936, 939 [158 Cal.Rptr. 266]; *People* v. *Faxel* (1979) 91 Cal.App.3d 327, 330 [154 Cal.Rptr. 132].)

■ Turning to appellant's contention, it is unequivocally clear the defense motion was based on the appointment of the specific psychiatrist, Dr. Vicory, to the exclusion of all others. The trial court was correct in denying the motion on the basis the defense has no right to appointment of any particular expert.

In *Ake* v. *Oklahoma, supra,* 470 U.S. at page 83 [84 L.Ed.2d at page 66], the Supreme Court rejected the notion that the defense had the right to deter-

mine what psychiatrist would be appointed once a proper showing of necessity had been made. "This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." (*Ibid.*)

The holding in *Ake* is in accord with the rule that while an indigent defendant has the right to appointed counsel, there is no right to appointment of any particular counsel. (*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 934-935 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984]; cf. *Harris* v. *Superior Court* (1977) 19 Cal.3d 786, 795-799 [140 Cal.Rptr. 318, 567 P.2d 750].) By parity of reasoning, appellant had no right to demand appointment of Dr. Vicory as opposed to any other qualified psychiatrist.

Because defense counsel was adamant in his insistence that only Dr. Vicory be appointed, the trial court did not abuse its discretion in denying the motion. While this is a sufficient answer to appellant's contention, we proceed to the merits of the motion on the basis of appellant's contention the trial court should have considered appointing another psychiatrist of the court's own choosing.

At the outset, we reject the suggestion that appellant's indigency, in and of itself, required granting the motion on the theory a wealthy person could have hired a psychiatrist to aid counsel in framing questions for trial. The state need not purchase for an indigent defendant all the assistance his wealthier counterpart might buy. (*Ake* v. *Oklahoma, supra,* 470 U.S. at p. 77 [84 L.Ed.2d at p. 63]; *Ross* v. *Moffit* (1974) 417 U.S. 600, 612 [41 L.Ed.2d 341, 352, 94 S.Ct. 2437]; *People* v. *Faxel, supra,* 91 Cal.App.3d at p. 331.) "The necessary parity between the indigent defendant and others is to be achieved not by permitting the indigent to spend public funds at his whim but rather by administration of the requirement of the showing required of the indigent." (*People* v. *Faxel, supra,* 91 Cal.App.3d at p. 331.)

The trial court did not abuse its discretion in denying the motion for appointment of a psychiatrist to assist defense counsel in framing questions. We share the trial court's skepticism to the idea of paying a psychiatrist to phrase questions to be asked of appellant so that the court-appointed psychiatrists could "make a thorough evaluation" of appellant's state of mind at the time of the incident.

Appellant had been examined twice by Dr. Stalberg and three times by Dr. Sharma. Both doctors thoroughly reviewed appellant's psychiatric records and the police reports. Both doctors had filed reports with the trial court expressing opinions on the issue of sanity. There is nothing in the record to indicate either doctor required additional information before any

opinion could be expressed as to appellant's sanity. Absent a showing that the two court appointed psychiatrists needed additional information, the trial court did not abuse its discretion.

Appellant's argument that this case was unusually complex due to the uncertain impact of Proposition 8 in restoring the M'Naghten test of insanity is unpersuasive. First, there was nothing new in the M'Naghten test itself, since it was the law in California from 1864 to 1978. (*People* v. *Drew* (1978) 22 Cal.3d 333, 340 [149 Cal.Rptr. 275, 583 P.2d 1318].) Second, although there was some uncertainty at the time of trial whether Proposition 8 adopted a "wild beast" (conjunctive) test for insanity, the instant case was tried on the correct theory that the *disjunctive* M'Naghten test was the law. (See *People* v. *Skinner* (1985) 39 Cal.3d 765, 775-777 [217 Cal.Rptr. 685, 704 P.2d 752].) Under these circumstances, the applicability of the M'Naghten rule of insanity did not compel, as a matter of law, the granting of the defense motion for the assistance of a psychiatrist at trial.

In *People* v. *Hunt* (1982) 133 Cal.App.3d 543 [184 Cal.Rptr. 197], the trial court denied a defense motion for appointment of a psychiatrist to aid in jury selection. On appeal, the ruling of the trial court was upheld in the absence of proof of a need for a psychiatrist. The court observed that a psychiatrist cannot be presumed to be any more qualified to select a certain type of juror than is a trial lawyer who knows the evidence and the issues. (*Id.*, at pp. 554-555.)

The reasoning in *Hunt* is applicable in the instant case. Appellant was represented by a thoroughly prepared deputy public defender, and there is absolutely no reason to believe a psychiatrist could have materially assisted in the framing of questions. The trial court did not abuse its discretion in denying the motion for appointment of another psychiatrist. (See *People* v. *Hunt, supra,* 133 Cal.App.3d at pp. 554-555; *People* v. *Worthy, supra,* 109 Cal.App.3d at pp. 522-523; *People* v. *Hurley* (1979) 95 Cal.App.3d 895, 899 [157 Cal.Rptr. 364]; *People* v. *Faxel, supra,* 91 Cal.App.3d at p. 331.)

III

### THE TRIAL COURT PROPERLY RELIED ON PENAL CODE SECTIONS 28 AND 29 IN PRECLUDING QUESTIONING OF DR. STALBERG REGARDING APPELLANT'S MENTAL CONDITION

Appellant next argues the trial court erred in applying Penal Code sections 25, 28 and 29 during the examination of Dr. Stalberg and Dr. Sharma in two respects. First, appellant contends that Penal Code sections 25,[1] 28[2] and

[1]Penal Code section 25 provides as follows: "(a) The defense of diminished capacity is hereby abolished. In a criminal action, as well as any juvenile court proceeding, evidence

29[3] are unconstitutional to the extent they deny the right to present a defense. Second, it is argued that the trial court unduly restricted the defense from presenting evidence of appellant's mental state on the night of the incident.

Appellant's arguments that Penal Code sections 25, 28 and 29 violate the right to present a defense have been consistently rejected. (*People v. McCowan* (1986) 182 Cal.App.3d 1, 12-15 [227 Cal.Rptr. 23]; *People v. Whitler* (1985) 171 Cal.App.3d 337, 340-341 [214 Cal.Rptr. 610]; *People v. Lynn* (1984) 159 Cal.App.3d 715, 732-733 [206 Cal.Rptr. 181]; *People v. Jackson* (1984) 152 Cal.App.3d 961, 967-969 [199 Cal.Rptr. 848].) We agree with the persuasive reasoning in the above-cited authorities and decline to consider the issue anew.

---

concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged.

"(b) In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense.

"(c) Notwithstanding the foregoing, evidence of diminished capacity or of a mental disorder may be considered by the court only at the time of sentencing or other disposition or commitment.

"(d) The provisions of this section shall not be amended by the Legislature except by statute passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the electors.

[2]Penal Code section 28 provides as follows: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.

"(b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing.

"(c) This section shall not be applicable to an insanity hearing pursuant to Section 1026 or 1429.5.

"(d) Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."

[3]Penal Code section 29 provides as follows: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

■ The remaining issue is whether the trial court unduly restricted direct examination of Dr. Stalberg and Dr. Sharma. Appellant's specific contention on this issue is as follows: "[T]he Trial Judge went so far as to refuse to allow defense counsel to ask the doctor whether Defendant's medical illness in anyway interfered with his having malice on the night of the offenses.

"Essentially, the Court's position was basically that the doctor could testify as to manifestations of the Defendant's mental illness. However, he could not in any way connect these manifestations to the issues of whether or not the Defendant had the specific intents of malice or premeditation at the time of the offenses."

Appellant's summary of the rulings of the trial court reveals the absence of error. Section 29 prohibits an expert from testifying whether the accused had the requisite mental state. (*People* v. *McCowan, supra,* 182 Cal.App.3d at p. 14.) In *McCowan,* the court held that section 29 precluded the psychiatrist "only from testifying whether defendant had one of the mental states required for the offenses—for example, malice aforethought. That ultimate determination must be made by the trier of fact." (*Ibid.*) The trial court's rulings were consistent with *McCowan.*

Appellant was not prohibited, on the other hand, from introducing evidence as to his mental condition on July 27, 1984. Dr. Stalberg did testify that on the date of the charged offenses appellant suffered from a mental disease described as chronic paranoid schizophrenia. Dr. Stalberg described in detail how he arrived at his diagnosis and the characteristics of chronic paranoid schizophrenia.

Appellant's history of delusions were described by Dr. Stalberg, and based upon these delusions Dr. Stalberg concluded many of the statements appellant made to the police were false. Dr. Stalberg was allowed to testify he doubted appellant planned his conduct, because such bizarre behavior tends to be impulsive.

In Dr. Stalberg's opinion, appellant's mental condition substantially affected his judgment and social behavior, and appellant's reasoning was psychotic. Appellant had suffered from schizophrenia since before 1983. Appellant engaged in obsessive behavior on July 27, 1984, the obsession being that he had been ordered by the government to write songs for well-known stars, the songs had been stolen and he was mistreated as a result.

Dr. Sharma's testimony covered the same areas as were covered by Dr. Stalberg, including his diagnosis of appellant as suffering from a schizophrenic disorder, paranoid type. Dr. Sharma indicated appellant suffered

from a fixed false belief, hallucinations, disorganized thinking, suspicion and distrust, all of which are symptoms of schizophrenia.

Dr. Sharma believed appellant's mental illness affected appellant's reasoning at the time of the charged offenses. Appellant's behavior controls were impaired and he engaged in compulsive behavior. Appellant was obsessed with the idea, according to Dr. Sharma, that his songs had been stolen, depriving him of his rightful livelihood.

The foregoing summary demonstrates that appellant was afforded the opportunity to present to the jury the relevant evidence as to his mental condition on July 27, 1984. (*People* v. *Whitler, supra,* 171 Cal.App.3d at p. 341; *People* v. *Jackson, supra,* 152 Cal.App.3d at p. 969.) Although the psychiatrists were not allowed to express an opinion on appellant's ability to premeditate or harbor malice, "[T]hey did present lengthy testimony describing [appellant's] mental illness and its effect on his conduct." (*People* v. *Jackson, supra,* 152 Cal.App.3d at p. 969.) The trial court properly conducted the trial in accordance with the limitations of Penal Code sections 25, 28 and 29.

IV

THE TRIAL COURT PROPERLY REFUSED TO INSTRUCT ON THE DEFENSE OF INVOLUNTARY INTOXICATION

██ Appellant argues the trial court erroneously refused to give a series of instructions relating the defense of involuntary intoxication to the charged offenses. This contention is based on testimony by appellant and his mother that he took one tablet of Triavil at 4 p.m. on July 27, 1984, and the testimony of Dr. Stalberg and Dr. Sharma that Triavil would make appellant's delusions worse.

In denying the defense request for instructions on involuntary intoxication, the trial court noted there was no evidence from which the trier of fact could find that appellant was intoxicated on alcohol or drugs. The court stated that the evidence of drug usage was relevant to the issues of mental state and intent which were covered by CALJIC No. 3.36.

The trial court properly refused to give CALJIC 4.23[4] on the effect of invol-

---

[4]CALJIC No. 4.23 (1981 rev.) provides as follows: "Intoxication is involuntary when it is produced in a person without his willing and knowing use of intoxicating liquor, drugs or other substance and without his willing assumption of the risk of possible intoxication.

"Proof of the involuntary intoxication of a defendant should be considered in determining whether the defendant had the necessary [criminal intent][mental state] at the time the crime is alleged to have been committed."

untary intoxication. In *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1], the court held that instructions on the defense theory of the case should be given only where supported by substantial evidence.

There is no substantial evidence in the record to support the conclusion appellant was intoxicated. Both appellant and his mother testified he took one Triavil, a prescribed medicine, at 4 p.m. on the date of the incident. Although appellant, appellant's mother, sister and brother all testified at trial, none mentioned that he appeared intoxicated. None of the witnesses at the scene of the offenses testified appellant appeared intoxicated.

After appellant's arrest, he cooperated in blood, breath and urine tests, each of which was negative. Appellant followed instructions during these tests without difficulty.

In his tape recorded statement to the police, appellant said the Triavil had no effect on him. Appellant said, "They don't do anything to me. It's just something they give me."

Given this record, the trial court properly ruled instructions on intoxication were not warranted. The record in the instant case is totally devoid of evidence of intoxication.[5] (*People* v. *Turner* (1984) 37 Cal.3d 302, 324-326 [208 Cal.Rptr. 196, 690 P.2d 669] [evidence of beer and PCP consumption not substantial]; *People* v. *Harris* (1981) 28 Cal.3d 935, 957-958 [171 Cal.Rptr. 679, 623 P.2d 240] [defendant's claim he was "pretty loaded" after two marijuana cigarettes held not substantial]; *People* v. *Flannel, supra,* 25 Cal.3d at p. 685 [evidence of consumption of beer, gin and whiskey not sufficient for instructions on intoxication].)

While the record is devoid of evidence that the Triavil caused appellant to be intoxicated, both Dr. Stalberg and Dr. Sharma were of the opinion Triavil could have worsened appellant's delusions. Both psychiatrists testified Triavil was a combination antipsychotic and antidepressant. The antidepressant aspect of Triavil, according to Drs. Stalberg and Sharma, would tend to increase delusions and hallucinations.

It is clear that the effect of Triavil in the instant case, if any, would have been in regard to appellant's mental disease, not intoxication, as the trial court correctly ruled. The jury was properly instructed pursuant to CALJIC

---

[5]We reject the People's argument that intoxication can only be the result of consuming alcohol and not drugs. Intoxication, in this context, "can refer to drug intoxication as well as alcohol intoxication." (*People* v. *Salazar* (1977) 74 Cal.App.3d 875, 884 [141 Cal.Rptr. 753].)

No. 3.36[6] on the effect of mental disease on appellant's ability to form the necessary mental states for first and second degree murder and attempted first degree murder. CALJIC No. 3.36 has been held to be an appropriate instruction for informing the jury of the impact of mental disease on the mental state of the defendant. (*People* v. *Leever* (1985) 173 Cal.App.3d 853, 865-866 [219 Cal.Rptr. 581].)

We conclude that appellant's ingestion of one Triavil nearly five hours before the charged offense, if relevant at all, pertained only to its effect on his mental disease and did not establish intoxication. CALJIC No. 3.36, in the factual setting at trial, satisfactorily related appellant's mental disease to the required mental states for murder and attempted murder. No additional instructions on intoxication were required.

## V

### THE JURY WAS INSTRUCTED THAT ATTEMPTED MURDER REQUIRED A FINDING OF EXPRESS MALICE

■ Appellant argues the instructions were contradictory regarding the required mental state of express malice for attempted murder. The jury may have been erroneously misled, so the argument goes, into believing implied malice was sufficient for attempted murder. (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764-765 [175 Cal.Rptr. 738, 631 P.2d 446], cert. den. (1982) 455 U.S. 922 [71 L.Ed.2d 464, 102 S.Ct. 1280].)

Appellant is correct in arguing that attempted murder is a specific intent offense which cannot be based upon a finding of implied malice. (*People* v. *Croy* (1985) 41 Cal.3d 1, 20-21 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 583, revd. on other grounds sub. nom. *California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446]; *People* v. *Murtishaw, supra,* 29 Cal.3d at pp. 764-765.) Appellant is incorrect, however, in his argument that the instructions at trial were contradictory and prejudicial.

The trial court exercised great care in advising the jury that attempted

---

[6]CALJIC No. 3.36 (1981 rev.), as given in the instant case, provides as follows: "Evidence has been received regarding a [mental disease] [mental defect] or [mental disorder] of the defendant [Daniel Lee Young] at the time of the offense charged [in Count I]. You may consider such evidence solely for the purpose of determining whether or not the defendant (Daniel Lee Young] actually formed the mental state malice aforethought which is an element of the crime charged [in Count I] to-wit murder in the first or second degree and further whether the defendant had an intent to kill which was the result of deliberation and premeditation which is a mental state required for murder in the first degree."

murder was a specific intent offense requiring express malice. Each instruction on attempted murder made reference to the required mental state of express malice.

The court first instructed the jury that murder required malice aforethought (CALJIC No. 8.10) and that malice could be express or implied (CALJIC No. 8.11). In defining attempt (CALJIC No. 6.00) the jury was informed an attempt requires "a specific intent to commit the crime." The court also instructed that "[f]or the crime of attempted murder there must be express malice. For the crime of attempted murder in the first degree you must also find that the defendant had an intent to kill which was the result of premeditation and deliberation." There is no ambiguity in these instructions on the element of express malice being required for attempted murder.

Moreover, the trial court specifically modified the instruction on the impact of mental disease on the mental state of attempted murder (CALJIC No. 3.36) to reflect the express malice requirement. The jury was instructed it could consider appellant's mental disease or disorder in determining whether appellant "actually formed the mental state of express malice aforethought which is an element of the crime charged in counts 2-49 to wit attempted murder in the first or second degree . . . ."

Appellant's contention that the instructions were confusing is based only on the fact the jury was not told the definition of implied malice in CALJIC 8.11 was limited to second degree murder. Review of the precision with which the trial court repeatedly instructed the jury that express malice was an element of attempted murder compels rejection of appellant's contention.

In any event, appellant could not have been prejudiced in the instant case since the jury returned a verdict of first degree murder in count I, on the theory of willful, deliberate and premeditated murder. Because a willful murder is intentional, and malice is express when there is an intent to unlawfully kill a human being, the verdict in count I necessarily rested on a jury finding that appellant acted with express malice. ". . . [O]nce a defendant intends to kill, any malice he may harbor is necessary express malice." (*People* v. *Murtishaw, supra,* 29 Cal.3d at pp. 764-765.)

Because the first degree murder in count one was perpetrated at the same time as the attempted first degree murders in counts 2-49, appellant's mental state at the time of the commission of all the offenses was indistinguishable. Considering that one of the required mental states for first degree murder in count one was express malice, the jury necessarily found express malice on the attempted murders committed as part of a single, indivisible transaction.

In *People* v. *Murtishaw, supra,* 29 Cal.3d at page 765, the court found instructions on implied malice in a charge of attempted murder harmless error where the defendant was also convicted of three counts of first degree murder arising out of the same incident. Similarly, in *People* v. *Kozel* (1982) 133 Cal.App.3d 507, 525 [184 Cal.Rptr. 208], the court found instructions on implied malice on a count of attempted murder to be harmless because the jury also convicted the defendant of a first degree murder committed at the same time.

As in *Kozel* and *Murtishaw,* the attempted murders in counts 2-49 were indistinguishable from the first degree murder with express malice in count one except for the tragic result. The issue of express malice was "necessarily resolved adversely to the defendant" in light of the verdict in count one, rendering the instructional error, if any, harmless. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 712 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on other grounds in *People* v. *Flannel, supra,* 25 Cal.3d at p. 684, fn. 12.)

## VI

### THE PSYCHIATRIC RECORDS WERE INADMISSIBLE AT TRIAL

■ Appellant argues the trial court committed error at the conclusion of the sanity phase in denying his motion to receive into evidence 90 pages of appellant's psychiatric records from Lake View Mental Health Center, Harbor-UCLA Medical Center and the Los Angeles County Department of Mental Health. The court excluded the records on the grounds there was no foundation and the records were hearsay.

The trial court did not err in refusing to admit the psychiatric records. We have examined the records and note that they contain numerous conclusions and entries of unknown source or reliability. While doctors from each of the three treatment centers did testify, appellant did not examine them as to the source and preparation of the psychiatric records. The court did not err in finding a lack of foundation.

For similar reasons, the court also properly sustained a hearsay objection to introduction of the records. The records were unquestionably offered for the truth of the matter asserted and were therefore hearsay. (Evid. Code, § 1200.)

No foundation was established for introduction of the psychiatric records under the business records exception to the hearsay rule. Evidence Code section 1271 provides as follows: "Evidence of a writing made as a record

of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made in the regular course of a business;

"(b) The writing was made at or near the time of the act, condition, or event;

"(c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and

"(d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

None of the four foundational requirements were satisfied as to the psychiatric records to invoke the business records exception to the hearsay rule. No other hearsay exception is suggested by appellant as being applicable.

Moreover, appellant has mischaracterized the psychiatric records as hospital records, which may be under some circumstances admitted under the business record exception to the hearsay rule. (See *People* v. *O'Tremba* (1970) 4 Cal.App.3d 524, 528-529 [84 Cal.Rptr. 336].) The records in the instant case were psychiatric records, which tend to be opinions, rather than the record "of an act, condition or event" which is admissible under Evidence Code section 1271. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 503 [116 Cal.Rptr. 217, 526 P.2d 225].) A psychiatric diagnosis is often merely the reasoning or thought process of the psychiatrist rendering the opinion, and as such cannot be deemed to be the record "of an act, condition or event." (*Ibid.*) Considering the unknown source of much of the information in the 90 pages of psychiatric records, as well as the subjective diagnoses contained therein, the court did not err in sustaining the hearsay objection. (*Ibid.*)

The function of the records at trial was (1) to refresh the recollection of the four psychiatrists who had treated appellant before the charged offenses and (2) as bases for the opinions rendered by Drs. Stalberg and Sharma regarding appellant's mental condition at the time of the offenses. In either event, the psychiatric records were not admissible in evidence. Documents used to refresh recollection are not admissible except when offered by the adverse party. (Evid. Code, § 771, subd. (b).)[7] Here appellant was the propo-

---

[7]Evidence code section 771, subdivision (b) provides as follows: "(b) If the writing is produced at the hearing, the adverse party may, if he chooses, inspect the writing, cross-examine the witness concerning it, and introduce in evidence such portion of it as may be pertinent to the testimony of the witness."

nent of the evidence and therefore unable to offer the records into evidence under Evidence Code section 771, subdivision (b).

While Drs. Stalberg and Sharma could rely on hearsay psychiatric reports of other doctors as bases for their opinions on appellant's sanity, the reports remained inadmissible hearsay. The rule which allows an expert to state the reasons upon which his opinion is based may not be used as a vehicle to bring before the jury incompetent evidence. (*People* v. *Odom* (1980) 108 Cal.App.3d 100, 115 [166 Cal.Rptr. 283].) In *Odom,* the court held it was proper to prohibit doctors testifying as to the defendant's mental state from detailing the contents of reports they had relied upon. (*Ibid.*) As in *Odom,* the psychiatric records relied upon by Drs. Stalberg and Sharma were inadmissible except to explain that they relied on the reports in reaching their conclusions. To admit the psychiatric records, in their entirety, would circumvent the hearsay rule.

Nor was appellant prejudiced by the trial court's ruling. Appellant presented testimony from Drs. Lui, Weinberg, Johnson and Faber, which established that appellant was diagnosed by each as schizophrenic prior to the commission of the charged offense. Because the jury was aware of the diagnoses of these four doctors, any error in refusing to admit the reports from the medical centers where the doctors worked was harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].)

Appellant's remaining contention that mechanical reliance in these circumstances on the hearsay rule violated due process under *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 312-313, 93 S.Ct. 1038], is without merit. In *Chambers,* the Supreme Court held it was a denial of due process for a state to mechanically apply its hearsay rule in such a way which would prevent a defendant from establishing that another person had repeatedly confessed to the commission of the offense for which the defendant was on trial under circumstances where the confessions were reliable. Unlike the situation in *Chambers,* exclusion of the psychiatric records in the instant case "did not elevate a fastidious adherence to the technicalities of the law of evidence over the right to a fair trial." (*People* v. *Blair* (1979) 25 Cal.3d 640, 665 [159 Cal.Rptr. 818, 602 P.2d 738].) Appellant's right to present a defense was protected by receipt of the live testimony of Drs. Lui, Weinberg, Johnson and Faber. Appellant has fallen woefully short of establishing that the trial court's ruling denying introduction of the psychiatric records deprived him of the fair opportunity to present a defense.

## VII

### THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR IN REFUSING TO INSTRUCT THE JURY ON THE CONSEQUENCES OF A VERDICT OF NOT GUILTY BY REASON OF INSANITY

■ Appellant's final contention is that the trial court committed reversible error at the sanity phase by refusing to instruct the jury on the consequences of a finding of not guilty by reason of insanity. The defense specifically requested this type of instruction at the outset of trial and before argument in the sanity phase, and reiterated the argument at the motion for new trial in light of this court's opinion in *People* v. *Moore* (1985) 166 Cal.App.3d 540 [211 Cal.Rptr. 856].

In *Moore, supra,* 166 Cal.App.3d at pages 555-557, this court held for the first time that upon request by the defense or the jury, an instruction should be given which details the consequences of a verdict of not guilty by reason of insanity. An instruction was suggested by the court in *Moore,* which has been subsequently adopted in substance in CALJIC No. 4.01. Recognizing that the holding in *Moore* represented a change in the law, the opinion was expressly declared to apply "prospectively not retroactively." (*Id.,* at p. 557.) Our holding of nonretroactivity was meant to convey that the rule established in *Moore* did not apply to sanity phase trials commenced before *Moore* became final.

In light of the prospectivity of the decision in *Moore,* that opinion provides no basis for overturning the sanity phase verdict. Trial in the instant case began with jury selection on December 24, 1984. The sanity phase began on February 12, 1985, and concluded with the jury's finding that appellant was sane on February 21, 1985. *Moore* was not decided until March 15, 1985, after completion of the sanity phase. The decision in *Moore* was therefore not in existence at the time of appellant's sanity phase trial, and not final in either the Court of Appeal or Supreme Court when appellant's motion for new trial was denied on March 22, 1985. (See Cal. Rules of Court, rules 24(a), 28(a)(2).)

Appellant's argument that the Court of Appeal, Third Appellate District, retroactively applied *Moore* in *People* v. *Dennis* (1985) 169 Cal.App.3d 1135 [215 Cal.Rptr. 750], does not alter our conclusion *Moore* is prospective only.[8] Our review of *Dennis* reveals no discussion of the issue of retroactivity of *Moore.* Because cases are not authority for issues not decided (*People* v.

---

[8]The trial in *Dennis* clearly preceded *Moore.* Appellant has provided this court with certified records from Dennis's trial in Yolo County, indicating Dennis was tried in November 1983. We take judicial notice of these records. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

*Banks* (1959) 53 Cal.2d 370, 379 [1 Cal.Rptr. 669, 348 P.2d 102]), *Dennis* is not authority for the retroactivity of *Moore.* We observed in *Moore* that the issue "appears to be one of first impression in this state," and accordingly we adhere to our view the opinion is prospective only.

The court in *Dennis* was free to apply the reasoning of *Moore,* as it did, in any case which came before it. This is not the equivalent of a holding that *Moore* is retroactive. The fact is the retroactivity of *Moore* was not discussed in *Dennis,* while the Attorney General here has specifically contended it is not retroactive, a position we cannot blithely ignore in light of our holding of prospectivity in *Moore.*

Denial of retroactive benefit of *Moore* does not result in constitutionally unequal treatment of appellant. "Inequality arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision making." (*Stovall* v. *Denno* (1967) 388 U.S. 293, 301, fns. omitted [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967].)

Because an instruction on the consequences of a verdict of not guilty by reason of insanity was requested by the defense, the issue remains whether the request should have been honored even if *Moore* is not retroactive. Under the circumstances existing at trial, we conclude the trial court did not commit error in refusing the instruction for the following reasons.

First, while some jurisdictions did require instructions on the consequences of a verdict of not guilty by reason of insanity, "California law [before *Moore*] does not call for that sort of instruction." (*People* v. *Smith* (1973) 33 Cal.App.3d 51, 73 [108 Cal.Rptr. 698].) Second, the subject of punishment, prior to *Moore,* had been forbidden territory under California law. Thus, references to the Governor's pardon power have long been prohibited in capital cases. (*People* v. *Ramos* (1984) 37 Cal.3d 136, 159 [207 Cal.Rptr. 800, 689 P.2d 430]; *People* v. *Morse* (1964) 60 Cal.2d 631, 643 [36 Cal.Rptr. 201, 388 P.2d 33, 129 A.L.R.3d 810].) References during trial to the consequences of a verdict of not guilty by reason of insanity have also been found to be error, due to misleading content, although not necessarily reversible. (*People* v. *Kozel* (1982) 133 Cal.App.3d 507, 532-535 [184 Cal.Rptr. 208]; *People* v. *Smith, supra,* 33 Cal.App.3d at pp. 71-75.)

While we reaffirm the reasoning of our opinion in *Moore,* we cannot overlook the impressive array of authorities prior to *Moore* which would have compelled any careful trial judge to steer clear of instructions on penalty after

a verdict of not guilty by reason of insanity. The trial court specifically ruled that penalty or punishment "is an inappropriate area" in refusing the instruction, a ruling in accord with authorities prior to *Moore*.

Third, the reason stated in support of the defense request for an instruction was the existence of a newspaper article on the case which purported to state it would only take one doctor to release appellant to the streets if he was found not guilty by reason of insanity. However, the record is totally devoid of any evidence any juror read the article, and the trial court repeatedly instructed the jury both before and after the article was printed to ignore any media coverage. ▮▮ "In the absence of strong evidence to the contrary, it must be presumed that the jury followed the court's instructions." (*People* v. *Almaraz* (1985) 173 Cal.App.3d 304, 319 [218 Cal.Rptr. 888].) There is no reason to believe, on this record, that the jury at any time violated the court's admonition. The existence of the newspaper article therefore did not mandate an instruction on the consequences of a verdict of not guilty by reason of insanity.

▮▮▮ Assuming, arguendo, the trial court should have instructed the jury on the consequences of a verdict of not guilty by reason of insanity, we do not believe it is reasonably probable that a result more favorable to appellant would occur if the instruction was given. Because any instructional error did not involve an element of the offense charged or an element of the defense of insanity, and because *Moore* is not constitutionally based, we examine for prejudice under the *Watson* harmless error test. (See *People* v. *Montero* (1986) 185 Cal.App.3d 415, 429-430 [229 Cal.Rptr. 750].)

Trial of the sanity phase was conducted under the M'Naghten test of insanity.[9] One of the two psychiatrists presented by defense at the sanity phase, Dr. Sharma, testified it was his opinion appellant was sane at the time of the offenses.

The other psychiatrist, Dr. Stalberg, wrote in his report to the trial court that if being wrong meant appellant was aware of the criminality of his act, and if understanding the nature and quality of one's actions meant appellant knew he was in a car running down humans, then appellant was sane. However, Dr. Stalberg felt that if one applied a less simplistic interpretation of "quality" as referring to good versus bad, appellant expected good to come from his conduct. Dr. Stalberg also believed appellant felt he was morally right in his actions.

---

[9]"A person is legally insane when by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the time of the commission of his offense." (CALJIC No. 4.00 (1982 rev.) as modified.)

Balanced against this relatively weak showing of insanity, was appellant's own tape-recorded statement following his arrest. The statement reveals that appellant stole his sister's car keys on the night of the offenses, which he had in fact planned to do the previous evening. Appellant wanted to get back at the general public to get the attention of the media. Appellant knew he was hitting people, and "put it on the floor" after striking his first victim. Appellant knew what he did was wrong and that he would go to jail.

In assessing prejudice, three factors are significant in the instant case. First, the evidence of insanity was weak. Second, appellant's tape-recorded statement, while consistent with his schizophrenia, was also consistent with a finding appellant could distinguish right and wrong and was aware of the nature and quality of his act. Third, unlike the normal situation in a criminal case, the defense was required to carry the burden of proof on insanity by a preponderance of the evidence.

Weighing the weak showing of insanity against the contents of appellant's tape-recorded statement, and recognizing that appellant had the burden of proof on the issue of insanity, we conclude any error was harmless. Appellant has not established that it is reasonably probable that a more favorable result would have occurred at trial had the jury received the *Moore* instruction. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

## CONCLUSION

The judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 13, 1987.