Filed 6/20/13  P. v. King CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KEITH HALLAN KING,<br><br>    Defendant and Appellant. | H037401<br>(Santa Clara County<br> Super. Ct. No. CC594125) |

Defendant Keith Hallan King appeals after a jury found him guilty of residential burglary.  (Pen. Code, §§ 459, 460, subd. (a).)[1]  The trial court found true allegations that he had five prior convictions that qualified as strikes (§ 667, subds. (b)-(i)) and as serious felonies (§ 667, subd. (a)).  He was sentenced to an determinate term of 29 years, consecutive to an indeterminate term of 25 years to life.

On appeal, defendant contends:  (1) he should have been permitted to change his plea to not guilty by reason of insanity; (2) there was no corpus delicti for two of the three theories of burglary; (3) the victim's 911 call should not have been admitted; (4) the prosecution should not have been permitted to amend the information during trial; (5) a defense expert's testimony was improperly limited; (6) the prosecutor committed misconduct; (7) the trial court did not properly answer a jury question; (8) there was

___

[1] All further statutory references are to the Penal Code unless otherwise indicated.

cumulative prejudice; and (9) the trial court erred by denying his motion to dismiss the strike allegations.

For reasons that we will explain, we will affirm the judgment.

## I.     BACKGROUND

### A.     *The Burglary*

On June 6, 2005, Lorena Wright lived on Grey Ghost Avenue in San Jose with her husband and three-month-old daughter. Wright's husband had gone to work at about 5:30 a.m. that day.

At about 6:00 a.m., Wright was awakened by a noise. She went into her dining room, carrying the baby, and saw defendant outside her house. Defendant was trying to take the screen off a window and was talking to himself. Wright called 911.

Wright told the 911 dispatcher that someone was trying to get into her house. In a whisper, she remained in communication with the dispatcher for about 13 minutes. She heard defendant in the backyard, trying to open a door. She then heard him on the side of the house, trying to open a window near the fireplace. She eventually heard a noise "[l]ike he break it open." About nine minutes after she first called 911, Wright heard defendant inside her house.

At trial, Wright described seeing defendant inside her guest bedroom, trying to open her large safe. She described how defendant was talking to himself each time she saw him, and how he was making a noise "kind of like" moaning.

About a minute after defendant's entry into the residence, the dispatcher informed Wright that an officer was pulling up in front of her house. The dispatcher instructed her to remain on the phone and "[s]tay in the bedroom" with the door locked, but after another two or three minutes, Wright went outside and contacted the officers.

San Jose Police Sergeant Russell Bence, one of the responding officers, went to the back of Wright's house. He saw defendant inside, walking towards the back door.

2

Upon seeing the officer, defendant turned and walked towards the front of the house. When the officer ordered him down to the ground, defendant complied. Defendant was taken into custody.

The parties stipulated that "none of the witnesses in this case observed the defendant with an erection, with his pants off, his zipper down, or his private parts exposed."

### B.      Defendant's Post-Arrest Statements

San Jose Police Officer Nicholas Barry interviewed defendant. He read the *Miranda* advisements,[2] and defendant indicated he understood each one. Defendant began talking after the officer asked if he wanted to explain what had happened.

According to defendant, "a woman friend at a party told him to go over to [Wright's] house . . . because the woman there needed him to show her daughter the difference between a hard penis and a soft penis." The woman at the house let him inside so he could "fuck in the safe because the safe was for fucking." The man of the house "was so mad that he was there to fuck his woman that he removed the screens from the house to make [defendant] look bad," although "the man was also secretly turned on that he was there to fuck his woman."

Defendant was jittery during the interview process, which can be a sign of being under the influence of a controlled substance. However, Officer Barry did not suspect that defendant was under the influence and thus did not order a blood or urine sample.

### C.      Prior Conviction Evidence

The jury heard that in 1980, defendant was convicted of two burglaries in Santa Clara County. In each case, the District Attorney alleged that defendant entered a building with the intent to commit theft.

---

[2] *Miranda v. Arizona* (1996) 384 U.S. 436.

### D.    Expert Witness Testimony

Dr. Brad Novak, a psychiatrist, testified for the defense.  He evaluated defendant in 2008.  He read police reports, mental health records, and interviewed defendant.  He noted that defendant had been hospitalized for psychiatric problems five times in the months leading up to the incident.  All of these hospitalizations were related to methamphetamine or alcohol use.

Dr. Novak believed that defendant suffered from several mental disorders at the time of the offense:  amphetamine dependence, alcohol dependence, cocaine dependence in remission, opiate dependence in remission, amphetamine intoxication, alcohol intoxication, amphetamine-induced psychotic disorder with delusions, and antisocial personality disorder.  In particular, he was suffering from paranoid delusions.

Dr. Novak explained that a psychosis is characterized by confusion and "a break from reality."  He opined that defendant's behavior at the time of the incident was consistent with someone who was intoxicated and psychotic.   Defendant's statements were consistent with amphetamine intoxication, which can cause a person to become hypersexual and confused.

### E.    Pretrial Proceedings

On June 8, 2005, the District Attorney filed a complaint charging defendant with first degree burglary by entering an inhabited residence with the intent to commit theft. (§§ 459, 460, subd. (a).)  The complaint alleged that defendant had four prior convictions that qualified as strikes (§§ 667, subds. (b)-(i), 1170.12) and three prior convictions that qualified as serious felonies (§ 667, subd. (a)).

On August 22, 2005, the trial court ordered defendant examined by a psychotherapist to provide trial counsel with information relevant to the decision "whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition."  (Evid. Code, § 1017.)

4

On November 8, 2005, the trial court declared a doubt as to defendant's competency. The court appointed three doctors to examine him.[3] On February 22, 2006, the trial court found defendant not competent to stand trial. On March 15, 2006, defendant was committed to the Department of Mental Health.

Criminal proceedings resumed on September 6, 2006, when the trial court found defendant had been restored to competency. The District Attorney then filed a first amended complaint, which added an additional strike allegation (§ 667, subds. (b)-(i), 1170.12) and two additional prior serious felony allegations (§ 667, subd. (a)).

On October 30, 2006, the trial court again declared a doubt as to defendant's competency. The court appointed two doctors to examine him. On January 31, 2007, the trial court found defendant not competent to stand trial. Defendant was committed to the Department of Mental Health on February 28, 2007.

Criminal proceedings resumed on August 25, 2008, when the trial court found defendant had been restored to competency.

On September 18, 2008, the District Attorney filed a second amended complaint, which alleged that defendant committed burglary by entering an inhabited residence with the intent to commit theft and with the intent to commit a sexual assault (§ 220). The second amended complaint alleged that defendant had five prior convictions that qualified as strikes (§§ 667, subds. (b)-(i), 1170.12) and as serious felonies (§ 667, subd. (a)).

On September 25, 2008, after a preliminary hearing, the District Attorney filed an information containing the same burglary charge and prior conviction allegations as in the second amended complaint.

---

[3] After the first two doctors disagreed about defendant's competency, a third doctor was appointed. The third doctor believed defendant was not competent to stand trial.

Defendant entered a plea of not guilty by reason of insanity (NGI) on September 29, 2008.  The trial court appointed three doctors to evaluate him.  Two of the doctors disagreed about whether defendant was sane at the time of the offense.  The third doctor did not render an opinion because defendant terminated the evaluation process early.

On March 4, 2009, the trial court again declared a doubt about defendant's competency.  On July 10, 2009, the parties stipulated that defendant was not competent to stand trial.  The trial court committed him to the Department of Mental Health that day.

On December 8, 2010, after a court trial regarding defendant's competency, the trial court found defendant competent to stand trial.

On January 24, 2011, defendant withdrew his NGI plea and entered a not guilty plea.

## F.    Trial Proceedings

A jury trial began on March 16, 2011.  On that date, the trial court granted defendant's request to bifurcate the prior conviction allegations, and defendant waived jury trial on those allegations.

On March 17, 2011, defendant moved to re-enter an NGI plea, but the trial court denied the motion.

On March 21, 2011, the District Attorney filed a first amended information that made non-substantive changes to the burglary charge.

On March 24, 2011, the prosecution began presenting evidence.

On March 25, 2011, the District Attorney moved to file a second amended information.  The prosecution proposed to add a third theory of burglary:  that defendant entered the residence with the intent to commit indecent exposure (§ 314).  The trial court granted the motion on March 28, 2011.

On March 30, 2011, the jury found defendant guilty of burglary.  On April 4, 2011, the trial court found all of the prior conviction allegations true.

At sentencing on September 23, 2011, the trial court imposed a 25-year determinate term for the five prior serious felony allegations with a consecutive indeterminate term of 29 years to life for the burglary. The trial court waived all fees and fines.[4]

## II.    DISCUSSION

### A.    *Denial of Motion to Change Plea*

Defendant contends the trial court abused its discretion by denying his motion to re-enter an NGI plea on March 17, 2011, the second day of trial. According to defendant, his "fluctuating mental state" provided the requisite "good cause" for the delay. (§ 1016.) Defendant notes that his attorney wanted him to enter an NGI plea at an earlier stage of the proceedings. However, he refused due to his mental illness, which made him distrust the legal system. To support his claim of distrusting the legal system, defendant points out that he brought many *Marsden* motions during the pretrial proceedings. (See *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).)[5]

Respondent asserts that the record fails to show any "fluctuating competency" between defendant's entry of a not guilty plea on January 24, 2011 and his request to re-

---

[4] We observe that the fees required to be imposed under section 1465.8 and Government Code sections 70373 and 29550.1 are not subject to a defendant's ability to pay and thus may not be waived. (See *People v. Kim* (2011) 193 Cal.App.4th 836, 842; *People v. Woods* (2010) 191 Cal.App.4th 269, 272; cf. *People v. Tillman* (2000) 22 Cal.4th 300, 302-303 [prosecutor's failure to object waives trial court's error in failing to impose a section 1202.4 restitution fine without a statement of reasons].) However, neither party raises this issue.

[5] Defendant first sought to replace appointed counsel on October 10, 2006. The motion was denied during an in camera hearing. A second *Marsden* hearing was heard and denied on February 16, 2011. Defendant subsequently requested he be permitted to represent himself (see *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*)), but then changed his mind. On March 16, 2011, the first day of trial, defendant indicated he either wanted to represent himself under *Faretta* or wanted a new attorney under *Marsden*. After an in camera hearing, the trial court denied the *Marsden* motion and defendant withdrew his *Faretta* request.

enter an NGI plea on March 17, 2011.  Respondent argues that the trial court properly found defendant's request to change his plea was untimely, since "there was nothing new in the record."

### 1.      Proceedings Below

Defendant initially entered an NGI plea on September 29, 2008.  On January 24, 2011, defendant withdrew his NGI plea and entered a plea of not guilty.

On March 16, 2011, the first day of trial, the trial court heard arguments about the scope of expert testimony from Dr. Novak.  Dr. Novak had been one of the evaluators of defendant's initial NGI plea.  He did not believe defendant was legally insane at the time of the offense, but the defense planned to have him testify about defendant's mental state.  The hearing concerned several issues, including (1) whether Dr. Novak would be permitted to testify that defendant was in a state of "psychotic confusion" and (2) whether defendant's statements to Dr. Novak would be admitted.

During discussions of the second issue, trial counsel asserted that she had been trying to convince defendant that he could "have both his trial and N.G.I.," but that "[h]e will not do that."  Following that comment, defendant indicated he wanted to withdraw his not guilty plea and re-enter an NGI plea.  Trial counsel indicated she needed to research whether defendant could change his plea and indicated that she was "not prepared to mount an N.G.I. trial."  Thus, the trial court continued the matter until the following day.

On March 17, 2011, defendant formally moved to reenter an NGI plea.  The prosecutor opposed the request and suggested that defendant was motivated by the previous day's discussion regarding the permissible scope of expert testimony.

Trial counsel reiterated that she had previously "begged [defendant] to proceed NGI" but that defendant had not trusted her at the time.  She explained that defendant began to trust her only after hearing her arguments during the previous day's discussion. Trial counsel reminded the court that defendant had been evaluated for an NGI plea but

8

that the full evaluation was not completed because of defendant's "fluctuating competency issues."

The trial court noted that defendant had been found competent on December 8, 2010 and that his decision to withdraw his NGI plea on January 28, 2011 was "made by a competent person who had the ability to decide for himself what he wanted to do." The trial court found that "nothing has changed" since defendant made the competent decision to enter a not guilty plea and noted that it was "the eve of trial." The trial court agreed with the prosecutor that defendant appeared to change his mind because of the discussion regarding the scope of Dr. Novak's testimony.

### 2.    Analysis

If a defendant has entered a not guilty plea, he or she "shall be conclusively presumed to have been sane at the time of the commission of the offense charged," but "for good cause shown," the trial court may allow him or her to enter an NGI plea "at any time before the commencement of the trial." (§ 1016.) The decision whether to allow such a change of plea "is a matter within the sound discretion of the trial judge." (*People v. Morgan* (1935) 9 Cal.App.2d 612, 615 (*Morgan*); see also *People v. Montiel* (1985) 39 Cal.3d 910, 923 (*Montiel*).)

At a minimum, in order to establish "good cause" for a change of plea from not guilty to NGI, the defendant must show a "plausible reason" for the delay. (*People v. Lutman* (1980) 104 Cal.App.3d 64, 68 (*Lutman*); see *Montiel, supra,* 39 Cal.3d at p. 921.) Some cases have also required the defendant to provide "reasonable grounds to believe that at the time of the commission of the crime," he or she was legally insane. (*Morgan, supra,* 9 Cal.App.2d at p. 615; see *Montiel, supra,* at p. 921; *People v. Herrera* (1980) 104 Cal.App.3d 167, 173.)

The defendant in *Lutman* established good cause for the delay in entering an NGI plea, because after he entered a not guilty plea, the law regarding insanity defenses changed, and he sought to enter an NGI plea within two weeks of the change in law. His

9

counsel's diligence met the "burden under Penal Code section 1016 to show 'good cause' for entry of the belated plea." (*Lutman, supra,* 104 Cal.App.3d at p. 66, fn. omitted.) The *Lutman* court held that the defendant was not required to "make an additional 'good cause' showing with respect to the *merits* of his insanity defense." (*Id.* at p. 67.)

In *Montiel,* the California Supreme Court declined to decide whether the "more restrictive standard" of *Lutman* is the proper test for a motion to change a plea under section 1016, or whether the defendant must also show that an NGI plea has potential merit. (*Montiel, supra,* 39 Cal.3d at p. 921.) The *Montiel* court did not need to reach the issue because in that case, the defendant's "lack of diligence," alone, justified denial of the motion. (*Id.* at p. 923.) There, the defendant moved to enter an NGI plea on the third day of trial, claiming that witness testimony had just alerted his attorney that he might have been "insane at the time the offense was committed." (*Id.* at p. 921.) The trial court found that the motion to change the plea was untimely, since the trial testimony was not new, but consistent with evidence adduced at the preliminary hearing and during pretrial discovery. (*Id.* at pp. 922-923.) The California Supreme Court found no abuse of discretion. (*Id.* at p. 923.)

In the present case, defendant contends that the trial court erred by focusing on defendant's competency at the time he entered his not guilty plea and the fact that "nothing ha[d] changed" since the entry of his not guilty plea. He claims these issues are not relevant to the question whether defendant had a "plausible reason" for the delay in seeking to change his plea. (*Lutman, supra,* 104 Cal.App.3d at p. 68.) According to defendant, his "fluctuating competency provided that reason."

We disagree that the trial court applied an improper standard or failed to consider defendant's "fluctuating competency." The trial court's remarks show that it considered whether defendant was incompetent at any time between the time he entered the not guilty plea and the time he moved to reenter an NGI plea. The trial court implicitly recognized that, at the time of his not guilty plea, defendant had the "ability . . . to

10

understand the nature of the criminal proceedings [and] assist counsel in the conduct of a defense in a rational manner." (§ 1369, subd. (a).) Trial counsel had encouraged defendant to plead NGI, but defendant had – while competent – rejected that advice. (Compare *In re Kubler* (1975) 53 Cal.App.3d 799, 805-806 [trial counsel was ineffective for failing to investigate basis for possible NGI plea and failing to advise defendant to enter an NGI plea].) Defendant did not produce evidence that he pleaded not guilty due to incompetence, nor did he show that he was incompetent at any time following entry of his not guilty plea. Lacking such evidence, the trial court reasonably found that defendant failed to show a "plausible reason" for his delay in request to enter an NGI plea. (*Lutman, supra,* 104 Cal.App.3d at p. 68.)

The trial court appears to have found that defendant simply changed his mind and that this was insufficient to meet the "good cause" standard of section 1016. Such a finding is consistent with cases considering section 1018, which governs a defendant's request to withdraw a guilty plea. For purposes of that statute, it is well-established that " '[a] plea may not be withdrawn simply because the defendant has changed his [or her] mind.' [Citation.]" (*People v. Breslin* (2012) 205 Cal.App.4th 1409, 1416.)

On this record, we find no basis to conclude that the trial court exercised its discretion "in an arbitrary, capricious or patently absurd manner resulting in a manifest miscarriage of justice. [Citation.]" (*People v. Shaw* (1998) 64 Cal.App.4th 492, 496.) The trial court did not abuse its discretion by finding that defendant failed to show a "plausible reason" for his delay in seeking to reenter an NGI plea (*Lutman, supra,* 104 Cal.App.3d at p. 68) and thus that he failed to show "good cause" as required by section 1016.

### B. *Corpus Delicti*

In accordance with the second amended information, the trial court instructed the jury that it could find him guilty of burglary based on three alternate theories: (1) entry with intent to commit theft; (2) entry with intent to commit sexual assault in violation of

11

section 220; and (3) entry with intent to commit indecent exposure in violation of section 314. Defendant claims that the prosecution failed to establish the corpus delicti for burglary under the latter two theories, since the only evidence of his intent to commit a sexual offense came from his extrajudicial statements. He contends that the trial court therefore erred by instructing the jury that it could find him guilty of burglary based on either of those two theories.

Respondent asserts this claim was forfeited by defendant's failure to object below. On the merits, respondent disputes that there was any instructional error, arguing that the corpus delicti rule does not require independent evidence of the target crime of a burglary.

### 1.      Proceedings Below

Below, defendant first raised issues relating to the corpus delicti in a section 995 motion filed on October 23, 2008. At that time, the information alleged that defendant committed burglary by entering the residence with the intent to commit theft or sexual assault in violation of section 220.

In his section 995 motion, defendant moved to dismiss the allegation that he committed burglary by entering the residence with the intent to commit sexual assault. He argued there was no evidence he had engaged in any assaultive conduct or in any conduct manifesting a desire for sexual relations with Wright. He further argued that his extrajudicial statements could not be used to show he had any intent to commit a sexual offense because of the corpus delicti rule. The prosecution opposed the section 995 motion, arguing that the corpus delicti rule did not require independent evidence of defendant's intent. The trial court denied the motion.

Defendant also raised the corpus delicti issue in his motions in limine. He again argued that there was insufficient evidence for the prosecution to proceed on the theory that he had entered the Wright residence with an intent to commit sexual assault. The trial court denied that motion during a hearing on March 18, 2011.

12

In opposing the filing of the second amended information, defendant argued that there was no evidence to support the theory that defendant entered the Wright residence with the intent to commit indecent exposure. He pointed out that the only evidence even suggesting such an intent came from his own statement.

At the end of trial, the trial court instructed the jury on burglary pursuant to CALCRIM No. 1700. In pertinent part, it informed the jury that in order to convict defendant, it had to find he entered an inhabited dwelling house with the intent "to commit theft or a violation of Penal Code Section 220 or a violation of Penal Code Section 314." It gave the jury separate instructions on the elements of those three offenses, as well as an instruction explaining the corpus delicti rule.[6]

### 2. Analysis

Defendant contends that there was no corpus delicti for burglary based on the theory that he entered the residence with the intent to commit sexual assault, nor for burglary based on the theory that he entered with the intent to commit indecent exposure. Defendant contends that the instructions therefore permitted him to be convicted of burglary based on legally inadequate theories. (See generally, *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

As an initial matter, we decline to find that defendant forfeited this issue by failing to object to the jury instructions. Defendant raised this issue several times during trial, but the trial court rejected defendant's arguments each time. Under the circumstances,

---

[6] The trial court instructed the jury on the corpus delicti rule, pursuant to CALCRIM No. 359, as follows: "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude that the other evidence shows that the charged crime was committed. . . . That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] The identity of the person who committed the crime may be proved by the defendant's statements alone. You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

13

"defendant may have reasonably believed" that advancing a further objection "would have been futile." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007.)

On the merits, however, we find no error.

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself – i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez* ).)

However, "[t]here is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues. [Citations.]" (*Alvarez, supra,* 27 Cal.4th at p. 1171.)

"It is well established . . . that the state of mind of the perpetrator is not an element of corpus delicti [citations]." (*People v. McGlothen* (1987) 190 Cal.App.3d 1005, 1014.) Thus, the corpus delicti rule does not require independent evidence of premeditation in a first degree murder case – the degree of the murder "may be shown by extrajudicial statements of the accused." (*People v. Scott* (1969) 274 Cal.App.2d 905, 907; see also *People v. Weaver* (2001) 26 Cal.4th 876, 929 [corpus delicti rule does not prohibit jury from relying on a felony-murder theory to elevate a homicide to first degree murder "when the only evidence of the sole qualifying felony . . . comes from the defendant's own statements"].) Likewise, where a defendant is "tried on an aiding and abetting theory, the requisite knowledge and intent required for aider-abettor liability are not elements of the corpus delicti that must be proved independently of any extrajudicial admissions for purposes of establishing the corpus delicti. [Citation.]" (*People v.*

*Gutierrez* (2002) 28 Cal.4th 1083, 1128-1129.)  And, in an attempted murder case, the defendant's "intent and motive" may be proven by the defendant's extrajudicial statements, as they are not part of the corpus delicti.  (*People v. Daly* (1992) 8 Cal.App.4th 47, 59.)

The only exception to this rule is "where a specific purpose is an element of the crime.  [Citation.]"  (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Elements, § 47, pp. 326-328, citing *People v. Hawkins* (2004) 124 Cal.App.4th 675, 680, 681 (*Hawkins*).)  In *Hawkins,* the defendant was convicted of opening a place for the purpose of unlawfully selling, giving away, or using a controlled substance in a violation of Health and Safety Code section 11366.  Since the purpose of unlawfully selling a controlled substance was "the essence of" the crime and one of the two required elements, it was part of the corpus delicti.  (*Hawkins, supra,* at p. 681.)

In a burglary prosecution, the intent to commit a specified offense is a theory of the case, not an element of the offense.  Burglary is defined as entry with the intent to commit theft or "any felony."  (§ 459.)  The "gravamen" of the offense is the entry, and the "exact burglarious intent" is merely a "theory of the case."  (*People v. Russo* (2001) 25 Cal.4th 1124, 1133 (*Russo*) [if the evidence shows "a single entry," but there is "possible uncertainty" as to the defendant's "exact burglarious intent, that uncertainty would involve only the theory of the case"]; see also *People v. Hernandez* (2009) 180 Cal.App.4th 337, 347.)

Here, defendant's entry into the residence was "the essence of" the burglary.  (*Hawkins, supra,* 124 Cal.App.4th at p. 681.)  The intent to commit sexual assault and intent to commit indecent exposure were merely theories of the case (*Russo, supra,* 25 Cal.4th at p. 1133), not part of the corpus delicti, and could therefore be proven by defendant's extrajudicial statements alone.

15

Because the intent to commit sexual assault or indecent exposure was not part of the corpus delicti of burglary, the instructions did not permit the jury to convict defendant of burglary based on a legally incorrect theory.

### C.     *Admission of 911 Call*

Defendant contends the trial court erred by allowing the prosecution to introduce the recording of Wright's 911 call into evidence. He contends the call should have been excluded pursuant to Evidence Code section 352, claiming it was (1) not relevant to any disputed issues at trial and (2) prejudicial because it allowed the jury to hear how frightened Wright was at the time of the incident.

#### 1.     Proceedings Below

Below, defendant objected to admission of the 911 call based on Evidence Code section 352. He argued that the 911 call was cumulative of other evidence and that it would inject an irrelevant issue – Wright's fear and fright – into the trial.

The prosecutor argued that the 911 call would prove that defendant actually broke in to the house and the length of time that defendant was inside the residence. The prosecutor noted that the incident had been six years earlier and that the 911 call would help with any forgotten details.

The trial court ruled that the 911 call was admissible. It found that the 911 call was not cumulative. Because the incident had occurred about five and a half years earlier, the trial court found that "the tape may turn out to be the most accurate and reliable evidence."

#### 2.     Analysis

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

16

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125 (*Rodrigues*).)

Defendant claims "[t]here was nothing probative in the tape." He points out that the only disputed issue at trial was his intent, and that the 911 call "did not add anything to demonstrate [his] intent." He also points out that Wright testified at trial and was able to provide details about the incident.

Defendant fails to show the trial court abused its discretion by finding that the 911 call had "probative value." (Evid. Code, § 352.) First, the trial court's ruling concerning the 911 call was made during pretrial motions, when the trial court did not know whether Wright would remember details of the incident that had occurred over five years earlier. "We may assess the trial court's ruling only on the facts made known to it at the time it made that ruling. [Citations.]" (*People v. Hernandez* (1999) 71 Cal.App.4th 417, 425.) In light of the passage of time since the incident, the trial court reasonably found that the 911 call would be relevant to prove the circumstances of the burglary.[7]

Second, even though defendant planned to dispute only his intent, the 911 call was still relevant to prove the circumstances of his entry. Even when a defendant choses to dispute only one element of the charged offense, the prosecution still must prove all the

_____

[7] In fact, when she was cross-examined about certain details of the incident at trial, Wright complained, "It's six years ago." She testified that the events were fresher in her mind at the time of the incident and that on "[s]ome points," her memory of the events had faded.

17

elements of that offense. (See *People v. Williams* (1988) 44 Cal.3d 883, 908, fn. 7.) Here, the prosecution had to prove that defendant entered the Wright residence, since that issue was put into dispute by defendant's not guilty plea. (See *People v. Rowland* (1992) 4 Cal.4th 238, 260 [a fact "generally becomes 'disputed' when it is raised by a plea of not guilty"]; § 1019.)

Defendant also contends that any probative value of the 911 call was outweighed by its prejudicial effect. He cites the trial court's subsequent comments about the 911 call to support his claim that the jury would have felt "a necessity to convict after hearing the fear in the victim's voice." At the hearing on defendant's *Romero* motion,[8] the trial court noted: "[W]e could hear Ms. Wright frightened, making that call, whispering as she moved about the house to try to keep herself and her child safe, brought that past experience right up to the present date in a very forceful manner. It was as if it was occurring, at least in the court's mind, at the time of the trial. [¶] The recording is – paints a picture, if words can, of a woman alone with her child, husband who has just gone to work, and so frightened it seemed almost paralyzed."

We have listened to the CD recording of the 911 call and conclude that the trial court did not abuse its discretion when it found that its probative value outweighed any prejudicial effect. The recording reflects that defendant attempted to get into the Wright house for about 10 minutes before he was successful. While speaking to the dispatcher, Wright whispered almost inaudibly. Although her fright was apparent, there was nothing particularly inflammatory about the recording. It could not have been shocking for the jury to learn that Wright was frightened when she awoke to find a man trying to break in to her house. In fact, Wright testified several times that she was scared. We find nothing about the 911 call to have presented a "substantial danger of undue prejudice." (Evid.

---

[8] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

Code, § 352; see *People v. Roybal* (1998) 19 Cal.4th 481, 517 [tapes of 911 call were not "highly inflammatory" despite the fact that they revealed that caller was upset].)

Given the apparent probative value of the 911 call at the time of the trial court's ruling, we cannot say the trial court abused its discretion when it concluded that the probative value of the recording outweighed any prejudicial effect.

### D.    *Mid-Trial Amendment of Information*

Defendant contends the trial court erred by permitting the prosecutor to file the second amended information on the fourth day of trial, after two witnesses (Wright and one of the officers) had completed their testimony and a third witness (another officer) had begun testifying. The second amended information added the third theory of burglary: that defendant entered the residence with intent to commit indecent exposure in violation of section 314.

#### 1.    Proceedings Below

The trial court held a hearing concerning the proposed second amended information on March 25, 2011. It noted that the witnesses who had already testified could be recalled, so defendant could question them about the indecent exposure theory. The prosecutor noted that recalling witnesses might be unnecessary, since defendant's intent turned on his post-arrest statement, which yet to be introduced. The prosecutor also argued that the evidence supporting the indecent exposure theory was the same as the evidence supporting the sexual assault theory.

The trial court heard further arguments about the proposed second amended information on the next day of trial, March 28, 2011. The prosecutor reiterated that the indecent exposure and sexual assault theories were based on the same evidence. The prosecutor offered to stipulate that no witness had seen defendant with his pants off, with his pants zipper down, or with an erection.

The trial court ruled that it would allow the prosecutor to file the second amended information, and it encouraged the parties to enter into a stipulation as proposed by the

19

prosecutor. A stipulation was later read into evidence. It provided: "That none of the witnesses in this case observed the defendant with an erection, with his pants off, his zipper down, or his private parts exposed."

### 2. Analysis

An indictment or information may be amended by the district attorney at any time before defendant pleads, and the court may allow amendment of the accusatory pleading "for any defect or insufficiency, at any stage of the proceedings" (§ 1009), "if there would be no prejudice to the defendant. [Citations.]" (*People v. Graff* (2009) 170 Cal.App.4th 345, 361-362 (*Graff*).)

The question of whether the prosecution should be permitted to amend the information is a matter "within the sound discretion of the trial court." (*People v. Winters* (1990) 221 Cal.App.3d 997, 1005.)

Several cases have found error where a late amendment changed the factual basis of the offense to a different incident. For instance, in *People v. Burnett* (1999) 71 Cal.App.4th 151 (*Burnett*), the late amendment allowed the jury to convict the defendant of brandishing and possessing a .357 magnum revolver instead of the .38-caliber revolver that had been specified in the original information. The evidence concerning the .357 magnum revolver came out for the first time at trial, when a witness testified that the defendant possessed that revolver before he possessed the .38-caliber revolver. The *Burnett* court held that because the late amendment changed the factual basis for the charged offense, it violated "the spirit, if not the letter, of section 1009." (*Id.* at p. 170.)

In *People v. Dominguez* (2008) 166 Cal.App.4th 858 (*Dominguez*), the late amendment allowed the jury to convict the defendant of unauthorized use of a vehicle based on either of two separate incidents, despite the fact that only one incident had been shown at the preliminary hearing. This court accepted the Attorney General's concession of error. (*Id.* at p. 866.)

20

In *Graff, supra,* 170 Cal.App.4th 345*,* the defendant was charged with three counts of committing a lewd or lascivious act with a child aged 14 or 15 years old.  (*Id.* at p. 351.)  The defendant was not held to answer on two other counts, which involved masturbation.  (*Ibid*.)  However, at trial, the prosecutor introduced evidence of the masturbation incidents and argued that the jury could convict the defendant of lewd acts based on those incidents.  This amounted to a constructive amendment, which prejudiced the defendant because he had not cross-examined the victim about the masturbation incidents.  (*Id.* at p. 362.)

Here, the amendment to add a third theory of burglary did not allow the jury to convict defendant based on a separate incident, as in *Graff, Burnett,* and *Dominguez.*  The theories of burglary all related to the same incident:  defendant's entry into the Wright residence on June 6, 2005.  Moreover, the evidence supporting the indecent exposure theory was the same as the evidence introduced at the preliminary hearing to support the original two theories:  defendant's post-arrest statement that he was at Wright's house "to show her daughter the difference between a hard penis and a soft penis."  Unlike in *Graff,* defendant did not need to significantly alter his trial strategy in response to the amendment.  The second amended information was filed well before the end of trial, so defendant had an opportunity to address the indecent exposure theory in argument and while examining some of the witnesses.  Indeed, the prosecutor stipulated that defendant had not exhibited any behavior indicating his intent to expose himself.

In sum, the amendment did not permit the jury to convict defendant of an offense not shown at the preliminary hearing nor cause him any prejudice, and thus it did not violate section 1009.  The trial court did not abuse its discretion by permitting the amendment.

### E.    *Limitation on Expert Testimony*

Defendant contends the trial court erred by limiting the scope of the testimony given by his expert witness, Dr. Novak.  He claims Dr. Novak should have been

21

permitted to testify that, at the time of the incident, defendant was in a state of "psychotic confusion."  Defendant claims that this limitation on Dr. Novak's testimony was error under state law and that it violated his federal constitutional right to present a defense.

### 1.  Proceedings Below

Below, the scope of Dr. Novak's testimony was first raised in the parties' motions in limine.  The prosecution moved to limit expert testimony about defendant's state of mind at the time of the offense.  Specifically, the prosecution requested that Dr. Novak not be permitted to testify that defendant was in a state of "psychotic confusion."

Defendant sought to admit Dr. Novak's expert opinion testimony, including his opinion that defendant was in a state of "psychotic confusion" at the time of the offense.

In its supplemental points and authorities regarding the scope of Dr. Novak's testimony, the prosecution reiterated that Dr. Novak should not be permitted to testify that defendant was in a state of "psychotic confusion" at the time of the offense.  The prosecution alerted the trial court to a case that had recently been published by this court, *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*).

On March 16, 2011, the trial court heard the motion concerning Dr. Novak's testimony.  Trial counsel noted that she and the prosecutor had discussed and clarified some of the issues, but that they still disagreed about the "psychotic confusion" issue.  The prosecutor argued that if the trial court permitted Dr. Novak to testify that defendant was in a state of "psychotic confusion" at the time of the offense, it would be tantamount to allowing him to testify about the ultimate issue of defendant's mental state.  The trial court decided to defer its ruling until it had read the *Cortes* opinion.

The following day, the trial court heard further arguments on the "psychotic confusion" issue.  Trial counsel suggested that the dispute would be resolved if she instructed Dr. Novak not to say the words "psychotic" and "confusion" together.  After the prosecutor objected that this would not go far enough, the trial court ruled that "no matter what language, he can't opine that [defendant] lacked the mental state required to

22

be convicted of a burglary." The trial court indicated it would allow Dr. Novak to opine that defendant was in a "drug-induced psychosis" but that the term "psychotic confusion" would be confusing to the jury.

Before Dr. Novak testified, the trial court held another hearing to discuss the scope of his testimony. Dr. Novak asked for "a little clarification on the psychotic confusion issue."

The prosecutor suggested that Dr. Novak could provide a diagnosis and describe the "symptoms of a diagnosis," but not "testify to what he believes the defendant's actual state of mind" was at the time of the incident. While Dr. Novak could testify that defendant was "suffering from psychosis at the time" and that "confused thoughts" were a symptom of psychosis, he could not say that defendant "was confused." Trial counsel noted that "the distinctions are so fine," but generally agreed with the prosecutor's description of the limitations on Dr. Novak's testimony.

The trial court attempted to further clarify the limitations, explaining that Dr. Novak could not tell the jury that defendant "was in a confused state on that day because that really goes to the ultimate decision the jury has to make as to whether or not [defendant] had a specific intent to do certain things, and that is solely their territory." Dr. Novak could opine that defendant's behavior was "consistent with that," however.

As noted above, Dr. Novak testified that defendant's behavior at the time of the incident was consistent with someone who was intoxicated and psychotic. He opined that defendant suffered from several mental disorders at the time of the offense, including amphetamine-induced psychotic disorder with delusions. He told the jury that a psychosis is characterized by confusion and a "break from reality." He further opined that defendant's statements were consistent with amphetamine intoxication, which can cause a person to become hypersexual and confused.

23

## 2. Analysis

We review the trial court's decision to admit or exclude evidence – including expert opinion testimony – for abuse of discretion. (See *Cortes, supra,* 192 Cal.App.4th at p. 908.)

The relevant statutes concerning expert testimony about a defendant's mental state are sections 25, 28, and 29. In section 25, the Legislature abolished the defense of diminished capacity and specified that, "[i]n a criminal action, . . . evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged." In section 28, the Legislature specified that "[e]vidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." In section 29, the Legislature restricted expert testimony as follows: "[A]ny expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged."

This court reviewed the scope of expert testimony concerning a criminal defendant's mental state in *Cortes, supra,* 192 Cal.App.4th 873. This court explained that a defendant "cannot put on an expert to testify that, because of his mental disorder or condition . . . , he or she did not have the ability, or capacity, to form or harbor whatever mental state is a required element of the charged offense, such as intent to kill, or malice aforethought, or premeditation, or deliberation." (*Id.* at p. 908.) But "the defendant *can* call an expert to testify that he had a mental disorder or condition . . . , as long as that testimony tends to show that the defendant did or did not in actuality" have the required

24

mental state, and as long as the expert does not "offer the opinion that the defendant actually did, or did not, harbor the specific intent at issue." (*Ibid*.)

The defendant in *Cortes* was convicted of first degree murder after he stabbed the victim 13 times during a fight. Before trial, a psychiatric expert interviewed the defendant and prepared a report in which he opined that the defendant had likely "entered a dissociated state" prior to the stabbing. (*Cortes, supra,* 192 Cal.App.4th at p. 893.) However, the trial court ruled that the expert could not testify about this conclusion. It ruled that the expert could only testify " 'that there is such a thing as a dissociative state' " and describe the characteristics of such a condition. (*Id.* at p. 900.)

In *Cortes,* the parties agreed that the judge had improperly restricted the expert testimony. The expert should have been able "to testify about defendant's particular diagnoses and mental condition and their effect on him at the time of the offense." (*Cortes, supra,* 192 Cal.App.4th at p. 909.) Specifically, the expert "should have been permitted to testify that in [his] opinion, defendant entered a dissociated state" and to describe "dissociation," including its "behavioral manifestations." (*Id.* at p. 911.) It also would have been proper for the expert to testify that dissociation can impair a person's memory "and *can* cause the person to act without conscious volition." (*Ibid*.) Such testimony was permissible because it would only "have given the jury a basis *to infer*" that the defendant did not actually have the mental state required for first degree murder. (*Id.* at p. 912.) In other words, the expert's proposed testimony "fell short" of expressing an opinion that the defendant actually lacked the required mental state. (*Ibid.*)

Similar issues were addressed in *People v. Nunn* (1996) 50 Cal.App.4th 1357 (*Nunn*), where the defendant was convicted of attempted murder after shooting at a group of men. A clinical psychologist evaluated the defendant and concluded that, due to inebriation and past traumatic experiences, the defendant had "fired his rifle impulsively." (*Id.* at p. 1362.) The trial court precluded the expert from giving this opinion, finding that "it was a conclusion concerning [the defendant's] intent at the time

of the shooting." (*Ibid.*) However, the expert was permitted to testify "extensively concerning [the defendant's] background and mental condition." (*Ibid.*)

The *Nunn* court found no error in the trial court's ruling. The court explained that "[a]n expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved." (*Nunn, supra,* 50 Cal.App.4th at p. 1364.) The expert could have opined that the defendant, "because of his history of psychological trauma, tended to overreact to stress and apprehension." (*Id.* at p. 1365.) The expert also could have opined that the incident "was the type that could result in an impulsive reaction from one with [the defendant's] mental condition." (*Ibid.*) However, the trial court properly prohibited the expert from testifying that the defendant "had acted impulsively, that is, without the intent to kill, that is, without express malice aforethought." (*Ibid.*)

In perhaps the closest case on point, limits on a psychiatric expert testimony were upheld in *People v. Young* (1987) 189 Cal.App.3d 891 (*Young*). In *Young,* the defendant was convicted of first degree murder after he drove onto a sidewalk and struck a number of pedestrians, killing one. The defendant had a history of mental illness (specifically, schizophrenia). At trial, two psychiatrists testified that the defendant suffered from delusions and that his "reasoning was psychotic." (*Id.* at p. 898.) One psychiatrist testified that the defendant's mental illness "affected [his] reasoning at the time of the charged offenses." (*Id.* at p. 907.)

On appeal, the defendant in *Young* complained that the psychiatrists were prohibited from testifying that his mental illness " 'interfered with his having malice on the night of the offenses.' " (*Young, supra,* 189 Cal.App.3d at p. 906.) The court disagreed, noting that the experts had been able to " 'present lengthy testimony describing [his] mental illness and its effect on his conduct.' [Citation.]" (*Id.* at p. 907.) The court held that despite the limitation on the expert testimony, the defendant was

26

"afforded the opportunity to present to the jury the relevant evidence as to his mental condition" at the time of the offense. (*Ibid.*)

Defendant contends that in this case, the trial court's ruling precluded Dr. Novak from testifying about one of his diagnosed mental disorders – psychotic confusion. He points out that in *Cortes,* this court found it was error to preclude expert testimony about the defendant's "particular diagnoses." (*Cortes, supra,* 192 Cal.App.4th at p. 909.)

The record does not support defendant's claim that "psychotic confusion" was a medical diagnosis. (Compare *Cortes, supra,* 192 Cal.App.4th at p. 895 ["dissociation is a well-recognized psychiatric condition" ].) Dr. Novak did not diagnose defendant with "psychotic confusion," but with a variety of other conditions. Dr. Novak used the term "psychotic confusion" only when describing the mental state that resulted from defendant's drug and alcohol intoxication on the night of the incident. Dr. Novak described many of defendant's behaviors and opined that they were "consistent with psychotic confusion," and he linked that opinion to his conclusion that defendant "did not have the intent to commit the crimes for which he is charged." At one point in his report, Dr. Novak stated, "Mr. King was confused and psychotic when he entered the victim's house. He did not have intent to commit a crime but rather was acting under the delusional belief that he needed to enter the home to be safe from the police who were chasing him."

Unlike in *Cortes*, it is clear in this case that Dr. Novak's use of the term "psychotic confusion" was not meant to be a diagnosis. It is also clear that Dr. Novak believed that being in a state of "psychotic confusion" was equivalent to a lack of intent to commit the charged offense. Thus, on this record, the trial court's ruling was not inconsistent with *Cortes, Nunn,* or *Young.* Considering that Dr. Novak's report linked that term with a lack of specific intent, testimony that defendant was in a state of "psychotic confusion" would have equated or come very close to stating that defendant did not actually have the required specific intent.

27

Defendant contends that the only permissible restriction was to preclude Dr. Novak from testifying that defendant "lacked the intent to commit the burglary." He argues that an expert may give testimony that is " 'tantamount' " to an opinion on the ultimate issue of the defendant's mental state, as long as the expert does not explicitly state that the "element was actually not present."

To support this argument, defendant points out that in *Cortes,* this court stated: " 'By its terms, section 29 prohibits an expert witness from giving an opinion about the ultimate fact whether a defendant had the required mental state for conviction of a crime. *It prohibits no more than that.*' [Citation.]" (*Cortes, supra,* 192 Cal.App.4th at pp. 910-911.) He points out that this court refused to preclude an expert from offering "any opinion that could be interpreted as 'tantamount' to testifying that the defendant did not have the mental state required by the crime charged, or had a state of mind that is the opposite of, or necessarily negates, the existence of the required mental state." (*Id.* at p. 910.)

Defendant's reading of *Cortes* is too narrow. In *Cortes,* this court rejected the Attorney General's argument that the expert "could not testify that *persons* in a dissociative state 'lose their volition and go on automatic,' because '[s]uch testimony would have been tantamount to testifying that *appellant* did not have the mental state required by the crime charged and would have violated section 29.' " (*Cortes, supra,* 192 Cal.App.4th at p. 910, italics added.) In other words, this court approved expert testimony about what "*persons* in a dissociative state" do, because such testimony would not be "tantamount" to an opinion about what *the particular defendant* actually did. (*Ibid.,* italics added.) Contrary to defendant's argument, "[a]n expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved." (*Nunn, supra,* 50 Cal.App.4th at p. 1364.)

In sum, in light of Dr. Novak's report linking the term "psychotic confusion" with his opinion that defendant lacked the specific intent necessary for burglary, the trial court

28

did not abuse its discretion by precluding him from using that term to describe defendant's mental state. As in *Young,* the trial court's ruling did not prohibit defendant from "present[ing] to the jury the relevant evidence as to his mental condition" on the day of the incident. (*Young, supra,* 189 Cal.App.3d at p. 907.) The trial court permitted Dr. Novak to offer his opinion that defendant suffered from psychosis and to explain to the jury the symptoms and effects of psychosis, including delusions and "confused thoughts." Dr. Novak also testified that defendant suffered from amphetamine-induced psychotic disorder with delusions and that the disorder is characterized by confusion. He also testified that defendant likely was suffering from amphetamine intoxication, which can also cause confusion. Thus, there was sufficient evidence from which the jury could deteremine whether appellant's mental state prevented him from actually forming the requisite specific intent required for burglary. We find no error.

### F. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by commenting that Dr. Novak had not testified about defendant's intent. He contends that the prosecutor improperly exploited the trial court's limitations on Dr. Novak's testimony. He also contends that trial counsel was ineffective for failing to object.

#### 1. Proceedings Below

We have already reviewed the proceedings and law regarding the limitations on Dr. Novak's testimony.

During closing argument, the prosecutor argued that defendant did not suffer from a mental disease, defect, or disorder that actually prevented him from forming the specific intent required for burglary. The prosecutor acknowledged Dr. Novak's opinion that at the time of the incident, defendant was "suffering from drug-induced psychosis with delusional beliefs" as well as antisocial personality disorder. The prosecutor argued that both conditions were "consistent with him committing the crime of burglary," noting that defendant's antisocial personality disorder showed he did not care that breaking in to

29

the house was illegal, and that the drug-induced psychosis showed he intended to commit a sex act.

The prosecutor continued this argument as follows: "Dr. Novak testified to mental conditions that are consistent with a motive and a reason why [defendant] broke into this house. But it's up to you to decide that. It wasn't for Dr. Novak. *Dr. Novak did not testify to the defendant's intent.* Maybe you're all waiting for that point in time: All right, Doctor, what is it that you're going to say? Did he or didn't he break in with the intent to commit the sex crimes? He did not testify to that because psychiatrists are not mind readers. They cannot get inside a person's mind and say what they were thinking at that moment, *and the law does not permit that testimony.* [¶] He did not testify whether [defendant] intended to steal, intended to violate Penal Code Section . . . 220 – or intended to expose himself. Dr. Novak simply testified to a psychosis and its symptoms. He also testified to his diagnosis of [defendant] having antisocial personality disorder."

The prosecutor later reiterated that Dr. Novak did not testify whether defendant had the specific intent to commit theft, sexual assault, or indecent exposure "because the law does not permit a psychiatrist to testify to such things." The prosecutor stated that the question of "what the defendant's actual intent was . . . is for the jury to decide."

Defendant did not object to the prosecutor's argument.

### 2. Analysis

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.]' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 679 (*Fuiava*).)

"A defendant generally ' " 'may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the

30

impropriety. [Citation.]' " [Citation.]' [Citation.] A defendant's failure to object and to request an admonition is excused only when 'an objection would have been futile or an admonition ineffective.' [Citation.]" (*Fuiava, supra,* 53 Cal.4th at p. 679.)

Acknowledging that his attorney failed to object below, defendant claims he received constitutionally ineffective assistance of counsel. "To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694.)

In arguing that effective counsel would have objected to the prosecutor's argument, defendant relies on *People v. Varona* (1983) 143 Cal.App.3d 566 (*Varona*), where the defendants were charged with rape and kidnapping. Their defense was that the victim was a prostitute who had solicited them and had voluntarily gone with them to engage in sexual conduct. At trial, the defendants sought to introduce evidence that the victim had a prior conviction for prostitution, but that evidence was excluded. Nevertheless, during closing argument, the prosecutor argued that "there was no evidence that the woman was a prostitute." (*Id.* at p. 568.)

The *Varona* court held that the evidence of the victim's prostitution conviction should have been admitted pursuant to Evidence Code section 782.[9] (*Varona, supra,* 143 Cal.App.4th at pp. 569-570.) Because of the trial court's ruling, it was improper for the prosecutor to argue that the defendants had "not brought forth evidence to corroborate an

---

[9] Evidence Code section 782 sets forth the procedure by which a defendant may introduce evidence of sexual conduct of the complaining witness to attack that witness's credibility.

essential part of [their] defensive story." (*Id.* at p. 570.) Such an argument is permissible "where a defendant might reasonably be expected to produce such corroboration." (*Ibid.*) However, in that case the argument was improper because the defense would have produced such evidence if not for the trial court's ruling. Further, by telling the jury that there was no evidence to support the defense theory, the prosecutor "knew that he was arguing a falsehood," since he had seen the evidence of the victim's prostitution conviction. (*Ibid.*)

In this case, the prosecutor did not argue that defendant should have presented evidence that was erroneously excluded. Defendant never sought to present expert testimony about his actual intent, as such evidence was clearly prohibited by section 29. The prosecutor's argument correctly informed the jury that "the law does not permit a psychiatrist to testify" about a defendant's actual intent and that the question of "what the defendant's actual intent was . . . is for the jury to decide."

We find no prosecutorial misconduct, and thus conclude that trial counsel was not ineffective for failing to object.

### G. Response to Jury Question

Defendant contends the trial court did not adequately respond to a question from the jury. The question was whether an individual juror had to decide, beyond a reasonable doubt, that defendant had the intent to commit a particular target offense – i.e., theft, sexual assault, or indecent exposure.[10] Defendant contends the trial court should have responded by informing the jury that "each [juror] must decide on a particular theory."

---

[10] The jury submitted two other requests during deliberations: (1) readback of Wright's testimony; and (2) "additional information, audio or transcript of interview with Mrs. Wright in regard to seeing [defendant] touch the safe." The court reporter provided the readback as requested. With respect to the latter request, the trial court told the jury, "The only information that may be considered is the evidence that was introduced during the trial."

32

Respondent contends that the trial court's response – directing the jury back to the burglary and reasonable doubt instructions – was correct, and that any error was both invited and forfeited.

### 1.      Proceedings Below

During deliberations on March 29, 2012, the jury asked the following question: "Does a juror need to decide that at least one of the three charges was intended to be committed or can a juror decide that they don't know which one of the three was intended but believe beyond a reasonable doubt that at least one of the charges was intended but not be sure which one?  If this is the situation, can the defendant be guilty?"

The prosecutor expressed concern about the jurors' confusion and proposed the parties do some research on how to address the question.  Trial counsel agreed.  The trial court agreed also, pointing out that CALCRIM No. 1700 was somewhat confusing to the extent it told the jury, "You may not find the defendant guilty unless you all agree that he intended to commit one of those crimes at the time of the entry," but also stated that "you do not all have to agree on which one of those crimes he/she intended."  The trial court noted that the issue was "going to be critical."

The trial court told the jury that the question was "very interesting" and that the jury would get an answer as soon as possible.

The following day, March 30, 2011, the parties discussed how to respond to the jury question.  Trial counsel argued that the jurors could not simply decide that defendant intended "some amorphous felony, which they are not sure of."  Trial counsel suggested that the answer to the jury's question should be "no," that defendant could not be found guilty if a juror believed that defendant intended one of the three target offenses but was not sure which one.  Trial counsel also suggested that the trial court "redirect their attention to CALCRIM 1700, CALCRIM 220, and . . . the other instructions that define the target felonies."

33

The prosecutor disagreed, arguing that a juror "could have doubt as to which one" of the offenses defendant intended as long as the juror had no reasonable doubt that defendant intended one of them. He noted that "CALCRIM 1700 doesn't deal with the exact issue that's been raised by the jury question." The prosecutor suggested the response be: "A juror may find the defendant guilty if the juror finds beyond a reasonable doubt that the defendant intended to commit at least one of the three alleged crimes at the time of entry. An individual juror does not need to decide which one of the three alleged crimes the defendant intended to commit so long as the juror finds beyond a reasonable doubt that the defendant intended to commit at least one of the three alleged crimes at the time of entry."

Trial counsel objected to the prosecutor's suggested language, arguing that the "safer" course of action would be to "refer the jurors back to CALCRIM 1700 and remind them they must find beyond a reasonable doubt that the defendant intended to commit at least one of the three alleged crimes at the time of entry."

The trial court noted that it was clear that the jurors did not all need to agree "on the same target offense." However, the jury question seemed to address the situation where an individual juror was not sure which offense was intended. The trial court asked, "[D]oes that then reduce the People's burden to prove the case beyond a reasonable doubt if a juror doesn't know which peg to hang his or her hat on but in his or her mind says, I know it's one of them, I just can't choose which one?"

Further discussions ensued, during which trial counsel mostly continued to advocate the jury be referred to CALCRIM No. 1700. At one point, however, trial counsel suggested the response be: "You may not find the defendant guilty of burglary unless each juror must find [sic] beyond a reasonable doubt that the defendant intended to commit at least one of the three alleged crimes at the time of entry."

34

The trial court ultimately responded to the jury as follows: "Please refer to Instructions 220 and 1700."[11]

### 2. Analysis

The Attorney General argues that we need not reach the merits of this issue because any error was invited by defendant below, since trial counsel advocated for the response given by the trial court – that is, to refer the jury back to the standard

---

[11] The written version of CALCRIM No. 220 provided: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

The written version of CALCRIM No. 1700 provided: "The defendant is charged in Count One with burglary in violation of Penal Code section 459. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant entered an inhabited dwelling house; [¶] AND [¶] 2. When he entered an inhabited dwelling house, he intended to commit theft or a violation of Penal Code section 220 or a violation of Penal Code section 314. [¶] To decide whether the defendant intended to commit theft, or a violation of Penal Code section 220 or a violation of Penal Code section 314, please refer to the separate instructions that I will give you on those crimes. [¶] A burglary was committed if the defendant entered with the intent to commit theft or a violation of Penal Code section 220 or a violation of Penal Code section 314. The defendant does not need to have actually committed theft or a violation of Penal Code section 220 or a violation of Penal Code section 314 as long as he entered with the intent to do so. The People do not have to prove that the defendant actually committed theft or violated Penal Code section 220 or Penal Code section 314. [¶] The People allege that the defendant intended to commit theft or violate Penal Code section 220 or violate Penal Code section 314. You may not find the defendant guilty of burglary unless you all agree that he intended to commit one of those crimes at the time of the entry. You do not all have to agree on which one of those crimes he intended."

35

instructions. Alternatively, the Attorney General argues that the claim of error was forfeited by trial counsel's failure to object.

On this record, we decline to find that the error was invited or forfeited. Although defendant did advocate for the response given by the trial court at several points during the discussion, he also suggested alternate responses. Under the circumstances, we cannot say that "defense counsel intentionally caused the trial court to err," such that any error was invited (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1234) or that "defendant both suggested and consented to the responses given by the court," such that any error was waived. (*Rodrigues, supra,* 8 Cal.4th at p. 1193.)

Turning to the merits, a trial court's response to jury questions is governed by section 1138. That statute provides: "After the jur[ors] have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (§ 1138.)

"[T]he statute imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1331 [court must "help the jury understand the legal principles it is asked to apply"].) However, "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*).)

36

"An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury."  (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)

Defendant contends the trial court failed to clear up the jury's confusion and that it should have told the jury that each juror was required to "decide on a particular theory." He relies on *People v. Smith* (1978) 78 Cal.App.3d 698 (*Smith*), where the defendant was charged with burglary based on two theories:  entry with the intent to commit larceny, and entry with the intent to commit assault.  The defendant in *Smith* argued that "all twelve jurors ought to be required to agree on a finding of one specific intent for burglary in order for guilt to be established."  (*Id.* at p. 707.)  In rejecting this argument, the court explained that the defendant "could have been found guilty if six of the jurors agreed that defendant had the intent to steal while the remaining six found that he had an intent to commit an assault by means likely to produce great bodily injury.  The principle announced is that as long as *each* of the twelve jurors finds that defendant had the specific intent to commit either of the two crimes mentioned, it is immaterial as to the division of the jurors between the two intended crimes."  (*Id.* at p. 708.)

The *Smith* case does not hold that when burglary is prosecuted on two alternative theories, an individual juror must decide between the two theories.  *Smith* addressed the more general question of whether jury unanimity is required when a burglary prosecution proceeds on alternative theories.  The defendant in *Smith* did not raise the specific argument defendant makes in this case, and thus we do not read it as supporting defendant's position.  (See *People v. Johnson* (2012) 53 Cal.4th 519, 528 [cases are not authority for propositions not considered].)

In fact, *Smith* itself makes clear that when the prosecution seeks a burglary conviction based on two alternative theories, a conviction may stand as long as each juror is convinced beyond a reasonable doubt that the defendant entered with the intent to commit at least one of the target offenses.  As the *Smith* court stated, the jury may convict

37

a defendant of burglary unless "one or more jurors determines that defendant had *neither* specific intent when he made his entry into the victim's apartment." (*Smith, supra,* 78 Cal.App.3d at p. 708, italics added.)

The California Supreme Court has repeatedly made it clear that when the prosecution alleges two or more target offenses in a burglary case, the individual jurors may disagree with one another "as to exactly how that crime was committed." (*Russo, supra,* 25 Cal.4th at p. 1132.) This is because the alleged intended crimes are not elements of the offense, but the " 'theor[ies]' of the case." (*Ibid.*) Thus, a burglary conviction will stand even if the jury has "uncertainty as to the exact burglarious intent." (*Id.* at p. 1133.) Because "the intent to commit *any* felony (or theft) suffices for burglary," "the jury need not unanimously decide, or even be certain, which felony defendant intended as long as it finds beyond a reasonable doubt that he intended some felony. [Citations.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 351.)

The California Supreme Court has further specified that when there are alternative theories of guilt, "the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt." (*People v. Santamaria* (1994) 8 Cal.4th 903, 919 (*Santamaria*).) In *Santamaria,* the court held that jurors need not unanimously agree whether a defendant is guilty as a direct perpetrator or as an aider and abettor when the prosecution has presented those as alternative theories of guilt. The court explained: "Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (*Ibid.*) The court noted that as long as each individual juror is convinced of the defendant's guilt beyond a reasonable doubt, it would be "absurd . . . to let the defendant go free because each individual juror had a reasonable doubt as to his exact role." (*Id.* at p. 920, fn. 8; see also *People v. Culuko* (2000) 78 Cal.App.4th 307, 323 [instruction properly stated "that each individual

38

juror did not have to decide whether any given defendant was the perpetrator or the aider and abettor"], italics omitted.)

The same rule applies when the prosecution presents various theories of first degree murder – the jurors need not decide on particular theory. "Each juror need only have found [the] defendant guilty beyond a reasonable doubt of the single, statutory offense of first degree murder." (*People v. Pride* (1992) 3 Cal.4th 195, 249 (*Pride*).)

In this case, it was unnecessary for each individual juror to decide on a particular theory of burglary before voting to convict. Defendant could be convicted of burglary even if "each individual juror had a reasonable doubt as to his exact role." (*Santamaria, supra,* 8 Cal.4th at p. 920, fn. 8.) As long as each individual juror had no reasonable doubt that defendant intended to commit theft, sexual assault, or indecent exposure at the time he entered the residence, the jury could find defendant guilty of "the single, statutory offense of [burglary]." (*Pride, supra,* 3 Cal.4th at p. 249.) Stated differently, as long as one or more jurors did not find that defendant had *none* of the alleged specific intents when he made his entry into the residence, he could be convicted of burglary. (See *Smith, supra,* 78 Cal.App.3d at p. 708.)

As each individual juror did not have to decide on a particular theory of guilt, it was not an abuse of discretion for the trial court to respond to the jury question by redirecting the jury to CALCRIM Nos. 220 and 1700. Those instructions explained that the jury could not find defendant guilty of burglary unless the jurors all agreed that he intended to commit one of the target crimes at the time of the entry and that they did not have to all have to agree on which one of those crimes he intended (CALCRIM No. 1700) but that they could not convict defendant of burglary unless they were convinced of his guilt beyond a reasonable doubt (CALCRIM No. 220). (See fn. 9, *ante.*) Redirecting the jury to these instructions was – as defendant acknowledged during the discussions below – the least "risky" approach. (*Beardslee, supra,* 53 Cal.3d at p. 97.)

### H. Cumulative Effect of Errors

Defendant contends that the combined effect of the asserted errors rendered his trial unfair. "The concept of finding prejudice in cumulative effect, of course, is not new. Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial. [Citations.] For example, the doctrine required reversal of a judgment when numerous minor instances of attorney misconduct during trial had a cumulatively prejudicial effect. [Citation.]" (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) In this case, we have rejected defendant's assignments of error and, therefore, there can be no cumulative prejudice.

### I. Denial of Romero Motion

Defendant contends the trial court abused its discretion by denying his motion to dismiss the prior convictions for purposes of the Three Strikes law. (See *Romero, supra,* 13 Cal.4th 497.) In particular, he contends the trial court erred by failing to consider his mental illness.

#### 1. Proceedings Below

The probation report described the circumstances of defendant's five prior strikes. The first strike was a 1975 burglary. Defendant and a companion went to an apartment complex. Defendant attempted to pry open the door to one apartment, but the resident stopped him by placing a chair in front of the door. The resident called the police, who discovered another apartment had been broken into. Defendant was sentenced to state prison in 1976.

The second strike was a 1978 robbery. Defendant and a companion went to a gas station. The companion held the gas station attendant at gunpoint while defendant took $30 to $40 in cash. Defendant received a county jail sentence.

The third strike was a 1980 burglary. Defendant and a companion forced entry into a motel room and stole a television, although defendant claimed he was only the

getaway driver and had not entered the motel room himself. He was sentenced to a four-year prison term.

The fourth strike was another 1980 burglary. Defendant entered an apartment while the victim was not at home. He pried the door open, and he was inside the apartment when the police arrived. He was sentenced to a four-year prison term, concurrent with the term imposed for the other 1980 burglary.

The fifth strike was a 1984 homicide. Defendant stabbed his "common-law wife" following an argument. Witnesses included the victim's mother and 15-year-old son. Defendant was convicted of voluntary manslaughter and sentenced to 28 years in prison.

The probation report reflected that defendant violated parole numerous times, and that he had a total of nine felony convictions and 13 misdemeanor convictions.

Prior to sentencing, defendant filed a motion to dismiss his prior convictions. In his written motion, defendant emphasized that he was "seriously mentally ill" and that he had been deemed incompetent to stand trial three times. He pointed out that the current burglary had not resulted in any physical harm or property loss. He noted that he had been in a paranoid state at the time of the burglary and that he had "made confused and wild statements to the police." Finally, he pointed out that due to his age (61 at the time of sentencing) and health problems, he was likely to die in prison if a lengthy sentence was imposed.

Defendant acknowledged that he had numerous prior convictions. However, he argued, they were largely nonviolent. He described his conviction of voluntary manslaughter as "a crime of passion stemming from circumstances unlikely to be replicated . . . ." He also asserted that all of his prior crimes were committed while he was "battling with untreated mental illness and addiction."

At the September 9, 2011 hearing on defendant's *Romero* motion, trial counsel reiterated some of these points. She noted that no physical harm was inflicted, that nothing was taken, and that the damage was minimal. She asserted that defendant "was

41

clearly essentially out of his mind" at the time of the offense and reminded the court of his long struggle with mental illness and sobriety. Trial counsel also noted that the strikes were "very, very old." Finally, trial counsel pointed out that defendant would receive a 25-year term for the prior serious felony allegations, and that since he was in his early 60's, imposing the minimum term would result in a life sentence.

The prosecutor argued that the jury found defendant was not "out of his mind" at the time of the offense. He noted that although the strikes were old, they were not "remote in time" because defendant had spent much of the interim in prison. He argued that the trial court should not consider the fact that defendant would receive a mandatory 25-year term for the prior serious felony allegations.

The trial court stated that it was "sympathetic to the notion that our community, our society, has failed to adequately deal with individuals who have emotional or mental health issues," but that its role was "very limited." It described Wright's 911 call (see part II. C, *ante*) and commented that the quick arrival of police had diffused the "potential for a very tragic end to that incident." The trial court also noted that defendant's prior offenses included manslaughter, "a very violent act." It further pointed out that defendant had only been out of custody for about two of the past 30 years, and contrasted his situation with a defendant who had intervening years of lawful or non-violent conduct. The trial court concluded that defendant "does not fall outside of the spirit of the three strikes law."

### 2. Analysis

In *People v. Carmony* (2004) 33 Cal.4th 367 (*Carmony*), the California Supreme Court set forth the basic principles applicable to a trial court's decision to strike a prior strike. " 'In *Romero,* we held that a trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, "in furtherance of justice" pursuant to . . . section 1385(a).' [Citation.] We further held that '[a] court's discretionary

42

decision to dismiss or to strike a sentencing allegation under section 1385 is' reviewable for abuse of discretion. [Citation.]" (*Carmony, supra,* 33 Cal.4th at p. 373.)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra,* 33 Cal.4th at pp. 376-377.)

" '[T]he Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' [Citation.]" (*Carmony, supra,* 33 Cal.4th at p. 377.) " '[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, "in furtherance of justice" pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence

43

should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.]" (*Carmony, supra,* at p. 377.)

As noted above, defendant's primary complaint is that the trial court did not consider his mental illness as a factor favoring dismissal of the strike allegations.[12]

A similar argument was made in *People v. Carrasco* (2008) 163 Cal.App.4th 978 (*Carrasco*), where the defendant's *Romero* motion was based on the fact that he had " 'significant mental health history and issues' " and was "suffering from the effects of long-term drug use." (*Id.* at p. 992.) In denying the motion, the trial court commented that case law did not authorize consideration of the defendant's " 'mental state, his mental condition, the reasons why he wanted to do these things.' " (*Id.* at p. 993.)

The *Carrasco* court rejected the defendant's claim that "the court erroneously found it lacked authority to consider [his] mental condition as a factor." (*Carrasco, supra,* 163 Cal.App.4th at p. 993.) The court explained, "The record reflects the trial court considered a wide range of appropriate factors in passing sentence, particularly the nature and circumstances of appellant's present and past convictions." (*Ibid.*) Since the trial court had expressly considered the defendant's "background and character in ruling on the motion," its remarks about his mental condition amounted to "an acknowledgement that the court could not give undue weight to an inherently speculative argument that defendant's mental state 'made him do it.' " (*Id.* at pp. 993-994.)

In the present case, the trial court made only one brief reference to the evidence of defendant's mental illness. However, the record does not demonstrate that the trial court failed to consider that evidence. As explained in *Carrasco,* "[w]e view the totality of the trial court's statement of reasons, not just one snippet." (*Carrasco, supra,* 163

---

[12] In his opening brief, defendant relied heavily on *People v. Smith* (2012) 203 Cal.App.4th 1051, review granted May 9, 2012, S201186. The subsequent grant of review in that case renders it unpublished and eliminates it as a basis of citable authority. (Cal. Rules of Court, rules 8.1105(e)(1) & 8.1115(a).)

44

Cal.App.4th at p. 993.)  As in *Carrasco,* the record reflects that the trial court believed that the totality of the circumstances did not justify dismissing any or all of defendant's strikes.  The trial court's remarks demonstrate that it considered the circumstances of the current offense, defendant's prior offenses, and his long history of criminality, before concluding that defendant "does not fall outside of the spirit of the three strikes law."

After referencing the evidence of defendant's mental illness, the trial court noted its role was "very limited."  This comment shows the trial court understood it had to follow *Romero,* which specifies that "[a] court's discretion to strike prior felony conviction allegations in furtherance of justice is limited."  (*Romero, supra,* 13 Cal.4th at p. 530; see also *Carmony, supra,* 33 Cal.4th at p. 378 ["a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances"].)  The trial court appears to have decided that in light of its "very limited" role and all of the relevant factors, the evidence of defendant's mental illness did not justify dismissing some or all of the strikes.

" '[W]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' [citation]."  (*Carmony, supra,* 33 Cal.4th at p. 378.)  Here, the trial court did not abuse its discretion by declining to find that the circumstances here were " 'extraordinary,' " such that defendant, who has " 'long and continuous criminal record,' " could " 'be deemed to fall outside the spirit of the very scheme within which he squarely falls.' "  (*Ibid*.)

## III.  DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

PREMO, ACTING P.J.

_____

GROVER, J.

46